955 F.2d 703
 UNITED STATES of America, Plaintiff-Appellee,
v.
Bobby Hugh HERRING, Geraldine, Sims Holley, a/k/a Tokie
Holley, Elmer Frank Taylor, Thomas Jan Wilkerson, a/k/a
Tommy Wilkerson, Charles Anthony Hatley, a/k/a Tony Hatley,
a/k/a Rat, Lamont Lawrence Meyers, James Michael Igo, a/k/a
Mike Igo, Robert Joseph Carter, a/k/a Buddy Carter, Leon
Robert Morrison, a/k/a Bobby Morrison, Jack Warren Ruff,
a/k/a Whitey, Robert Alex Hooks, a/k/a Bob Hooks,
Defendants-Appellants.
 No. 90-7039.
 United States Court of Appeals,
Eleventh Circuit.
 March 11, 1992.
 
 James W. May, Gulf Shores, Ala., for Herring.
 James E. Atchison, Hess, Atchison & Horne, William B. Jackson, II, Mobile, Ala., for Holley.
 Gregory M. Friedlander, Mobile, Ala., for Wilkerson.
 Edward R. Tibbets, Mobile, Ala., for Meyers.
 Reggie Stephens, Mobile, Ala., for Igo.
 W.A. Kimbrough, Jr., Turner, Onderdonk & Kimbrough, PA, Mobile, Ala., for Carter.
 Delano J. Palughi, Mobile, Ala., for Morrison.
 Paul D. Brown, Mobile, Ala., for Hooks.
 Judy A. Newcombe, Spanish Fort, Ala., for Hatley.
 James Byrd, Mobile, Ala., for Taylor.
 Thomas Jeffery Glidewell, Glidewell and Associates, Mobile, Ala., for Ruff.
 J.B. Sessions, III, U.S. Atty., Donna E. Barrow, Asst. U.S. Atty., Mobile, Ala., for U.S.
 Appeal from the United States District Court for the Southern District of Alabama.
 Before FAY and HATCHETT, Circuit Judges, and GIBSON*, Senior Circuit Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 After reviewing this criminal case in which the issues were hotly contested, we affirm the convictions and the sentences because the district court did not err in its rulings, and the prosecutor's activities did not constitute misconduct requiring a new trial.
 
 I. FACTS
 
 2
 On December 20, 1987, FBI agents executed sixteen search warrants in the Mobile, Alabama, and Pascagoula, Mississippi areas at the residences of Charles Hatley, James Igo, Lamont Meyers, Robert Carter, Thomas Wilkerson, and Walter Dixon.
 
 A. Wilkerson
 
 3
 At Wilkerson's residence, in an upstairs bedroom which had been converted into an office, the FBI agents found Wilkerson and Robert Hooks with four television sets tuned to football games, and two telephones on each of the two desks in the room. Two of these phones had speed dialing capabilities. Additionally, the agents found gambling records including line sheets, betting slips, customer lists, sports schedules, account sheets, reference materials, and other gambling paraphernalia. In the drawer of the desk where Wilkerson was seated, the agents recovered $12,691 in United States currency and $300 in cash attached to a piece of paper bearing the name "Igo." Wilkerson's desk also contained two weapons, one of which was loaded. While at the residence, the agents placed a recording device on one of the telephones in the office and recorded numerous calls from customers wanting to place bets on football games.
 
 
 4
 After being given his Miranda rights, Hooks executed a written waiver of rights form, and stated that he had been working for Wilkerson for the past two to three months booking bets over the telephone. Hooks also told the agents that Wilkerson's wife and two sons participated in taking bets.
 
 
 5
 On January 1, 1988, law enforcement officers conducted a second search of Wilkerson's home. Officers went again to the upstairs office and found Wilkerson and Robert Morrison present. Wilkerson had replaced all of the equipment that had been previously seized in the first raid, including televisions, calculators, and telephones. Once again, gambling records and paraphernalia were seized. This time, FBI agents conducted a search of a vehicle parked in the driveway of the home and found in the trunk of the vehicle a brown bag filled with gambling records. Along with the other evidence, the contents of the brown bag were sent to the FBI gambling laboratory in Washington, D.C. Marian Moore, a fingerprint specialist at the laboratory, analyzed the contents of the bag and the seized records and determined that twenty-one latent prints were the prints of Morrison.
 
 B. Carter
 
 6
 In December, the FBI agents also searched Carter's apartment and found three television sets tuned to football games in the same room with two desks, a copy machine, and three telephones. The agents seized hundreds of gambling records including line sheets, customer account lists, sports schedules, betting slips, mailing lists, labels, and other paraphernalia. The line sheets seized from Carter's apartment and Wilkerson's home matched.
 
 C. Hatley, Igo, Meyers, and Dixon
 
 7
 Agents conducted a similar search at Hatley's home and seized similar documents, paraphernalia, and cash. Federal agents executed a separate search warrant for the vehicle Hatley used and seized from the vehicle additional gambling records, including betting slips, personal banking records, and football schedules. Searches at the homes of Igo, Meyers, and Dixon resulted in similar findings.
 
 II. PROCEDURAL HISTORY
 
 8
 The appellants, along with ten others, were indicted in a two-count indictment charging that they had engaged in an illegal gambling business in violation of 18 U.S.C. §§ 1955 and 2, and that they had engaged in a conspiracy in violation of 18 U.S.C. § 371.
 
 
 9
 Pursuant to a plea agreement, Dixon testified that Taylor placed bets with him, and that Taylor was a "bookmaker." Dixon also testified that from September, 1987, through December, 1987, he and Carter transacted gambling business on almost a daily basis with the exchange of money through a courier named "Ruff." Dixon further testified that before placing a bet he would first get the line information from Carter, Wilkerson, Holley, and Taylor.
 
 
 10
 Witnesses testified that Bobby Herring received bets from 1986 through 1988 through the telephone. Several witnesses also testified that they knew Wilkerson, Carter, Hatley, Meyers, Igo, Holley, Hooks, Morrison, Ruff, Herring, and Taylor (the bookmakers) and had placed bets with them paying "juice" on losing bets.[1]
 
 
 11
 At trial, FBI Special Agent Ray Stirling, an expert in the field of gambling records analysis, testified that in his opinion the records indicated the following time spans of gambling activity: (1) Carter's records spanned October 13, 1987, through January 2, 1988; (2) Hatley's records spanned September 14, 1987, through December 20, 1987; (3) Igo's records spanned September 2, 1987, through December 20, 1987; (4) Meyers's records spanned November 24, 1987, through December 20, 1987; (5) Dixon's records spanned November 24, 1987, through December 20, 1987; and (6) Wilkerson's records spanned October 21, 1987, through January 1, 1988. Additionally, Stirling testified that approximately $5,151,080 in wagers were placed with Carter; $121,010 in wagers were placed with Hatley; $48,465 in wagers were placed with Igo; $29,445 in wagers were placed with Meyers; $157,815 in wagers were placed with Dixon; and $1,183,730 in wagers were placed with Wilkerson. Stirling also testified that in his opinion, the betting ring was structured as follows: Carter and Hatley were exchanging wagers; Igo was transferring wagers to Carter; Carter wagering with Igo; and Carter and Igo exchanged wagers with Holley and Herring. Additionally, Stirling testified that wagers were exchanged between Carter and Ruff, Hatley and Holley, Hatley and Taylor, Igo and Wilkerson, Dixon and Carter, Dixon and Wilkerson, and Wilkerson and Hatley.
 
 
 12
 Wilkerson, Carter, Hatley, Holley, Ruff, Hooks, and Morris were convicted on both counts. Meyers, Igo, Herring, and Taylor were convicted only of the conspiracy count.
 
 III. ISSUES
 
 13
 The appellants raise the following issues on appeal: (1) whether the district court erred in allowing the expert to express an opinion regarding layoff bets, based on a definition inconsistent with the law of this circuit; (2) whether a sufficient degree of prosecutorial misconduct existed making the trial unfair; (3) whether excessive or prejudicial delay existed in the furnishing of the transcript necessary for completion of the record on appeal; (4) whether the district court erred in denying an evidentiary hearing on Hatley and Wilkerson's motions to suppress evidence; (5) whether the district court abused its discretion in admitting certain evidence; (6) whether the government's response to a defense counsel's objection during closing argument was an impermissible and prejudicial comment on Carter's decision not to testify; (7) whether the government's cross-examination of the appellants' expert witnesses was proper; (8) whether the judge's conduct denied the appellants a fair trial; (9) whether the district court properly denied the motion for severance; (10) whether the district court abused its discretion in admitting the government's tape recordings; (11) whether the search of Wilkerson's vehicle exceeded the scope of the warrant; (12) whether the district court committed reversible error in failing to instruct the jury as the appellants requested; and (13) whether the evidence was sufficient to sustain the convictions.
 
 IV. DISCUSSION
 A. The Expert Witness
 
 14
 Despite the numerous errors the appellants claim, only two of the issues they raise merit extended discussion. The appellants contend that the linchpin in the prosecution's case was Agent Ray Stirling, the sole expert witness the government produced to show the interdependence of the appellants based on the exchange of layoff bets. The appellants argue that aside from the testimony of Agent Stirling, the prosecution's case was comprised mostly of misconduct which denied them a fair trial. Thus, Agent Stirling's expert testimony regarding layoff bets and the claims of prosecutorial misconduct merit discussion.
 
 
 15
 The appellants argue that the expert testimony of FBI Agent Ray Stirling regarding the definition of a layoff bet was inconsistent with the law of this circuit and thus constituted reversible error. Specifically, the appellants contend that Agent Stirling's improper legal definition of a layoff bet was erroneously applied to the evidence in this case to create an interdependence between the appellants which did not exist.
 
 
 16
 Since the opinions of the former Fifth Circuit before October 1, 1981, are binding on this court, this court's definition of a layoff bet is governed, in part, by Fifth Circuit law which restricts layoff bets to bets bookmakers place for the purpose of ridding themselves of excess bets to achieve a balanced book. See Bonner v. City of Prichard, Alabama, 661 F.2d 1206 (11th Cir.1981). See United States v. Avarello, 592 F.2d 1339, 1351 n. 21 (5th Cir.), cert. denied, 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979). In order to assist the nongambler understand the concept of a layoff bet, we provide an excerpt from what the Fifth Circuit termed the anatomy of a bookmaking operation. In United States v. Milton, 555 F.2d 1198, 1200 (5th Cir.1977), the court revisited its explanation of the bookmaking operation that it fully explained in United States v. Box, 530 F.2d 1258, 1260-62 (5th Cir.1976), and provided the following brief explanation:
 
 
 17
 [A] successful bookmaker is not a gambler but a business man. He makes his profit not from winning bets, but from collecting a certain percentage of the amount bet that the losing bettors must pay for the privilege of betting. This percentage, usually ten percent, is called 'juice' or 'vigorish.' A bookmaker normally has a 'line' or 'point spread' on each game on which he is taking bets. The calculation is that an equal number of wagered dollars will be attracted to either side of the point spread. Thus, if the line in [college] football is [Miami] by six over [Washington], the bookmaker expects some bettors to wager as much on [Washington] to win or to lose by six or fewer points as others will bet on [Miami] to prevail by more than six points. When this is true, the bookmaker is guaranteed a profit of exactly ten percent. When it is not, he may win more than ten percent or fail to clear ten percent. When the bets placed with a bookmaker are unbalanced, the risk-averse entrepreneur will adopt one of two strategies. The bookmaker may adjust his line up or down until it reaches equilibrium. More likely, he will seek to 'layoff' a bet to another bookmaker or to a mere bettor. That is, the bookmakers will bet the more popular of the two teams in the amount (ideally) by which bets on that team exceed the sum bet on the disfavored team at a given point spread. If the popular team wins, he will thus pay out to his bettors more than he took in, but will offset this disbursement by his own layoff winnings. By this device, the bookmaker seeks to balance his books and assure himself neither more nor less than a ten percent profit.
 
 
 18
 Milton, 555 F.2d at 1200 (footnotes omitted). See Avarello, 592 F.2d at 1343 n. 5; Box, 530 F.2d at 1260-62. Thus, for purposes of determining whether a bet is a layoff bet, courts must examine (1) the purpose of the bet, and (2) the occupation of the person making the bet. See Box, 530 F.2d at 1262. Unless bookmakers place bets for the purpose of ridding themselves of excess bets in order to achieve a balanced book, the bet is not a layoff bet. See Box, 530 F.2d at 1262.
 
 
 19
 In this case, when asked to define a layoff bet, Agent Stirling responded, "very basically, a layoff is a wager from one bookmaker to another bookmaker. Now, that layoff could be--the motive for the layoff could be from several different factors. Most generally, layoff is recognized as a balancing tool." Contrary to the appellants' argument, Agent Stirling's definition of a layoff bet is consistent with the law of the Eleventh Circuit and recognizes that bookmakers can and do make personal wagers which are not layoff bets.
 
 
 20
 The expert clearly established that the occupation of the bettor had to be "bookmaker" and the bet had to be utilized as a "balancing tool." The fact that the expert preceded his statement with the words "most generally" is of no significance. Based upon this definition, Agent Stirling used the term layoff or laid off bet to explain exhibits to the jury and to characterize transactions between the bookmakers. The district court's ruling allowing this definition of layoff did not constitute error. See Avarello, 592 F.2d at 1351 n. 21. Moreover, as in Avarello, the district court rendered any possible misunderstanding about the definition of "layoff bet" harmless with a proper jury instruction as to the weight to be given expert testimony and as to this circuit's definition of a layoff bet. In the charge to the jury, the district court instructed that
 
 
 21
 a bookmaker may take wagers on both teams in a sporting event. When a bookmaker receives an excess of bets on one side of a sporting event, in an effort to balance his books and reduce his risk of loss, he may layoff this excess by betting that amount on the team--on the team on which the excess is placed. In that way, a bookmaker directs the excess of his customers' bets either to another bookmaker who can use more bets on that side of the line, or to any other individual willing to accept the bet. All bets between bookmakers, however, are not necessarily layoff bets. A layoff bet should be defined solely in relation to the occupation of and the purpose of the person making the bet. The occupation and motives of the person accepting the bet are irrelevant to the definition.
 
 
 22
 Additionally, the district court stated in its charge to the jury that "merely because an expert witness has expressed an opinion, does not mean that you must accept that opinion." Thus, the district court carefully instructed the jury concerning the necessary factual conditions for linking one bookmaker to another based on the exchange of layoff bets, and the court admonished the jury to give no special deference to the expert testimony of Agent Stirling. The district court took adequate steps to protect against the danger that the expert's opinion would be accepted as a legal conclusion. See Avarello, 592 F.2d at 1352; Milton, 555 F.2d at 1204-05. Furthermore, the district court's instructions regarding layoffs were consistent with the testimony of the appellants' expert witnesses.
 
 
 23
 The district court's instructions gave the jury the proper law, and nothing indicates that the jurors did not abide by the court's instructions. This court has held that "a jury is presumed to follow jury instructions." Adams v. Wainwright, 709 F.2d 1443, 1447 (11th Cir.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984); see Grizzell v. Wainwright, 692 F.2d 722, 726-27 (11th Cir.1982), cert. denied, 461 U.S. 948, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983); United States v. Kabbaby, 672 F.2d 857, 863 (11th Cir.1982). Thus, the district court properly instructed the jury both as to the weight to be given expert testimony and the Eleventh Circuit's definition of a layoff bet. See United States v. Jones, 712 F.2d 115, 121 (5th Cir.1983); Avarello, 592 F.2d at 1392.
 
 B. Prosecutorial Misconduct
 
 24
 Each of the appellants also contend that prosecutorial misconduct existed during the trial and that the cumulative effect of the misconduct denied them a fair trial. One incident of alleged prosecutorial misconduct that several of the appellants raise is the prosecutor's comment that "Mr. Carter hasn't testified." Carter, one of the appellants, claimed that this was an improper comment on his silence in violation of his Fifth Amendment privilege against self-incrimination.
 
 
 25
 This court has held that "[t]he standard for determining if a prosecutor has made an impermissible comment on a defendant's right not to testify is 'whether the statement was manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " United States v. Watson, 866 F.2d 381, 386 (11th Cir.1989) (quoting United States v. Vera, 701 F.2d 1349, 1362 (11th Cir.1983) (quoting United States v. Dearden, 546 F.2d 622, 625 (5th Cir.), cert. denied, 434 U.S. 902, 98 S.Ct. 295, 54 L.Ed.2d 188 (1977))). Additionally, this court has noted that "in applying this test, the court must 'look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury.' " United States v. Vera, 701 F.2d 1349, 1362 (11th Cir.1983) (quoting United States v. Forrest, 620 F.2d 446, 455 (5th Cir.1980)). We recognized in Watson that the district court is responsible for making this determination, because the district court has the opportunity to observe the prosecutor's demeanor first hand. See Watson, 866 F.2d at 386. Thus, the district court's determination of whether manifest intent was present is reviewed only for abuse of discretion. See Watson, 866 F.2d at 386. The prosecutor did not argue that Carter could have or should have testified. The record shows that the prosecutor's comment was fairly intended to rebut a defense lawyer's improper objection. After reviewing the comment in the context in which it was made, we hold that the district court did not abuse its discretion in determining that the prosecutor's comment was not manifestly intended to comment on Carter's right not to testify.
 
 
 26
 The appellants also contend that the following acts constituted prosecutorial misconduct: (1) the prosecutor discussed Agent Mitchell's testimony with Agent Glass before Agent Glass testified, in violation of the rule of exclusion of witnesses; (2) the prosecutor lied concerning the fact that she had discussed Agent Mitchell's testimony with Agent Glass, even after Agent Glass admitted discussing the testimony; (3) the prosecutor introduced the issue of nonpayment of taxes during her closing argument when no such evidence had been presented during the trial; and (4) the prosecutor made comments in her closing argument which suggested that the appellants' courtroom behavior demonstrated a lack of respect for the court and the jury.
 
 
 27
 This court has held that "[r]eversal on the basis of prosecutorial misconduct requires that the misconduct be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.' " United States v. McLain, 823 F.2d 1457, 1462 (11th Cir.1987) (quoting United States v. Blevins, 555 F.2d 1236, 1240 (5th Cir.1977), cert. denied, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978)); see United States v. Weinstein, 762 F.2d 1522 (11th Cir.1985), modified and reh'g denied, 778 F.2d 673 (11th Cir.1985), cert. denied, 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986); United States v. Alanis, 611 F.2d 123 (5th Cir.), cert. denied, 445 U.S. 955, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980). Additionally, we have held that prosecutorial misconduct may be rendered harmless by curative instructions to the jury. See Weinstein, 762 F.2d at 1542; United States v. Nickerson, 669 F.2d 1016, 1020 (5th Cir. Unit B 1982); United States v. Lichenstein, 610 F.2d 1272, 1282 (5th Cir.), cert. denied, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980). Thus, "[p]rosecutorial misconduct is a basis for reversing an appellant's conviction only if, in the context of the entire trial in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused." United States v. Lopez, 898 F.2d 1505, 1511 (11th Cir.1990); United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989), cert. denied, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990).
 
 
 28
 In this case, the prosecutor did not engage in conduct so pronounced and persistent that it permeated the entire atmosphere of the trial. For approximately five weeks, thirteen defense lawyers representing thirteen defendants engaged the prosecutor in battle (as they had a right to do) and the prosecutor introduced thousands of documents into evidence. It was a hotly contested trial. For example, on one occasion, after the jury had been removed from the courtroom, the district court stated:
 
 
 29
 [A]ll of you are officers of the court. You are all competent and capable of defending your clients. But if you are trying to confuse the issues to get error into this record, I'll say this: that you're really, two or three of you, are really trying hard to do that. And I recognize that. But I don't appreciate it and I don't think it--I don't think it's the kind of thing that officers of the court ought to be engaging in.
 
 
 30
 The district court stated in another side bar conference:
 
 
 31
 [Y]ou guys are officers of this court. Now, you've been trying to try the court from the very beginning. First you tried to try me, and that didn't work. You tried to try Judge Milling, and that didn't work. You've been trying the prosecution all during this case because--I don't know why you don't get out there and defend your own clients rather than trying the government and trying everybody else. Now, you've been trying the judge all the way through this thing. You come up to the bench and you don't address the issue. You want to address something that happened two or three weeks ago. You never talk about the issue.
 
 
 32
 As we stated earlier: the trial was long, the issues were hotly contested, and the lawyers were doing their jobs in placing before the jury facts and theories to aid their clients. Nevertheless, the district judge remained impartial, assessed the prejudicial effect of the prosecutor's remarks or actions, and issued curative instructions when needed. We give considerable weight to the district court's assessment of the prejudicial effect of the prosecutor's remarks and conduct. See Weinstein, 762 F.2d at 1542; Nickerson, 669 F.2d at 1020. Thus, we hold that although the prosecutor should not have made some comments, in the context of the entire trial, and in the light of the district court's curative instructions, the statements were of no consequence and constituted harmless error.[2] We have reviewed all other claimed errors and find each of them to be without merit.
 
 V. CONCLUSION
 
 33
 Accordingly, the convictions and judgments are affirmed.
 
 
 34
 AFFIRMED.
 
 
 
 *
 Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 "Juice" is a required percentage of a losing bet, usually ten percent, that losing bettors pay for the privilege of betting. This concept makes a $100 bet in essence a $110 risk
 
 
 [2]
 The appellants also contend that the district judge's act of touching a defense lawyer on the arms, face, and mouth during a side bar discussion in the presence of the jury was improper and created an overwhelming impression that he was not impartial, and thus denied the appellants a fair trial. After several complaints from the law clerk, the clerk, and the prosecutor regarding the excessive noise at the side bar, the district judge merely touched the lawyer in order to get his attention and have him lower his voice. Additionally, the side bar conference was held away from the jury, and over thirty people were present at the conference obscuring any view of the touching from the jury. Thus, we hold that no appearance of partiality existed and conclude that this issue is without merit