[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-12225
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 23, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-60156-CR-JIC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEVEN RICHARD ALLEN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 23, 2006)

Before DUBINA, HULL and FAY, Circuit Judges.

PER CURIAM:

Steven Richard Allen is appealing his conviction and his 327-month sentence for conspiring to possess with intent to distribute less than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Allen argues on appeal that the district court committed reversible error in: (1) admitting evidence of prior uncharged extrinsic bad acts; (2) denying his motion for a mistrial after a government witness testified that Allen was on probation at the time he committed the instant offense; (3) overruling an objection to remarks made by the prosecutor during closing arguments; and (4) sentencing Allen by (i) applying a two-level role enhancement, pursuant to U.S.S.G. § 3B1.1(c), and (ii) imposing a sentence that exceeded a co-conspirator's sentence. For the reasons set forth more fully below, we affirm Allen's conviction and sentence.

A federal grand jury returned a three-count indictment, charging Allen and his co-conspirators, Robert Allen,[1] William Joel Garcia, and Jesus Francisco Frias, with the above-referenced conspiracy offense ("Count 1"), as well as with using and carrying a firearm, that is, an AMT .380/9mm pistol, an EA Company J-15

---

[1] Because Allen and his brother, Robert Allen, share the last name, Robert Allen will be referred to as "Robert" for purposes of this opinion. The record reflects, or the parties agree, that, (1) in lieu of trial, Robert entered into a plea agreement with the government, agreeing to plead guilty to Counts 1 and 2 of the indictment; (2) after Robert testified during Allen's trial, pursuant to a "cooperation" provision in his plea agreement, the government filed a motion to reduce Robert's sentence, pursuant to U.S.S.G. § 5K1.1; and (3) after granting this motion, the district court sentenced Robert to 133 months' imprisonment on Count 1 and to a consecutive 60 months' imprisonment on Count 2.

.223 caliber rifle, and a Smith & Wesson .38 caliber revolver, during and in relation to a drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A) ("Count 2"), and with being a felon in possession of one or more firearms in and affecting commerce, in violation of 18 U.S.C. § 922(g)(1) ("Count 3").  Prior to trial, the government filed an information and notice of its intent to use Allen's prior felony convictions for sentencing purposes, pursuant to 21 U.S.C. § 851, listing four prior felony convictions.

The government also filed a pre-trial notice of its intent to rely on several prior bad acts, pursuant to Fed.R.Evid. 404(b).  As part of this notice, the government identified the following five prior robberies in Florida on which it intended to offer Robert's eyewitness testimony and tape-recorded conversations between the co-conspirators: (1) in the middle of 2002, Allen, armed with a pistol and wearing a ski mask, robbed a Quick Stop store and shot the store manager, resulting in the manager's paralysis; (2) in January and March 2004, Allen committed an armed robbery of a woman named "Tameka"; (3) between February and March 2004, Allen and Perrone "LNU" committed an armed robbery of drug dealers, during which robbery Allen shot a man in the hand with the same 9 mm as the pistol in the instant case; (4) between April and May 2004, Allen, Garcia, and Frias committed an armed robbery of used-car dealers, during which robbery Allen

3

entered a warehouse wearing a ski mask and the men took $2,400, two lap-top computers, and other personal property; and (5) in June 2004, Allen, again armed with a pistol and wearing a ski mask, robbed a "Mr. Softies Ice Cream Store" of $1,500, and he pistol-whipped the store manager.

Co-conspirator Frias filed a motion in limine, seeking to exclude this Rule 404(b) evidence, which Allen adopted. The district court subsequently conducted a hearing on this motion in limine, at the conclusion of which it granted the motion to the extent the court excluded the first and last prior bad acts as unduly prejudicial due to the violence involved. The court, however, denied the motion as to the remaining three acts, finding that (1) the proffered evidence was admissible under Rule 404(b) to show "intent, preparation, plan, knowledge, identity or absence of mistake or accident," and (2) the probative value of this evidence outweighed its prejudicial effect.

During the co-conspirators' joint jury trial, Steve McKean, a special agent with the Alcohol, Firearms and Explosives Bureau ("ATF"), testified as to the following facts. On June 3, 2004, while Agent McKean was acting undercover as a disgruntled cocaine carrier, a paid confidential informant ("CI") set up a meeting for him with Robert. During this meeting, Agent McKean told Robert that (1) Agent McKean had been working for a Colombian drug-trafficking

4

organization for over eight years, (2) he was upset that this organization would not loan him money that he needed, and (3) he wanted Robert to steal for him cocaine from a "stash house" used by this organization. Agent McKean also told Robert that he would learn the location of the "stash house," which was guarded and normally contained 2 to 30 kilograms of cocaine for short periods of time, only when it was time for him to pick up the 1 to 2 kilograms of cocaine that he was scheduled to deliver. Although Agent McKean informed Robert that he wanted to be paid 5 kilograms of cocaine for setting up this robbery, Robert offered him 10 kilograms of cocaine in exchange for the anticipated 25 to 30 kilograms of cocaine.

Also during this meeting, Robert explained to Agent McKean that he and Allen regularly robbed drug dealers and would commit this robbery. After Agent McKean discussed that, when he picked up the drugs at the "stash house," he would honk his horn and the garage door would be opened so he could enter and load his car with the cocaine, Robert explained that he and his co-conspirators would enter the garage when it opened and "whack" the guard. Additionally, Robert stated that he had the necessary "tools" for the robbery, including a .38 caliber revolver and a .45 caliber pistol.

On June 8, 2004, Agent McKean, Robert and Allen met to finalize their robbery plans and, during a tape-recorded conversation,[2] agreed that Allen would come with Agent McKean to the "stash house," lying down in a van, and Allen and Robert would kill the guard. Robert stated that (1) the co-conspirators had hands-free headsets that they used to communicate with each other during robberies, and (2) Robert would be waiting down the street with the CI, acting as a lookout. Allen also added that, for the first time, Robert had given him permission to kill during the robbery. Furthermore, on June 14, 2004, during a short meeting between Agent McKean and Robert, Agent McKean told Robert that a shipment of cocaine would arrive in the next seven to ten days, and Robert responded that (1) the co-conspirators were ready to commit the robbery, (2) Agent McKean would not be hurt, and (3) Agent McKean would receive his share of the stolen drugs.

On June 22, 2004, in response to Agent McKean calling Robert and telling him that the drug organization had alerted him to the arrival of a shipment of cocaine, Agent McKean and Robert again met, this time in a parking lot, with Robert arriving at the meeting in a vehicle with Allen and co-conspirator Frias. Robert, Allen, and Frias then told Agent McKean that they were ready to commit the robbery, and they agreed to follow Agent McKean back to his office to pick up

_____

[2] The tape recording of this meeting was admitted into evidence at trial and played for the jury.

6

the vehicle to use during the robbery and to finalize their plans. As Agent McKean drove out of this parking lot, followed by Robert's vehicle, he saw the CI and co-conspirator Garcia standing next to a Dodge Durango. Moreover, as Agent McKean pulled into the parking lot of the undercover warehouse he was using for the investigation, he saw Robert's vehicle and the Dodge Durango drive around the block before pulling into the lot.

Agent McKean then showed the co-conspirators the Ford Explorer he intended to use during the robbery. After they went inside the warehouse, Robert suggested that they not kill anyone so they could avoid detection and, instead, slit the guard's throat. Robert also told Agent McKean that Allen and Frias would be in the van with Agent McKean so they could quickly incapacitate the guard, and that Garcia was their "big gunman." Agent McKean left the meeting, at which time other law-enforcement officers entered the warehouse and arrested the co-conspirators. Allen, who, along with Garcia, was placed in the back of a police vehicle with a malfunctioning recorder, stated that (1) his brother and another person had approached him about stealing 25 kilograms of cocaine from Colombian drug traffickers, (2) Allen did not intend to give Agent McKean his share of the cocaine, and (3) during past robberies, Allen had not tried to shoot anyone. Additionally, the government introduced evidence that, on searching

7

Garcia's Dodge Durango, they recovered: (1) a loaded .380 semi-automatic pistol from inside a blue nylon bag, (2) a loaded .223 rifle, (3) a loaded Smith and Wesson .38 caliber revolver, (4) a ski mask, (5) a pair of walkie-talkies, (6) an aluminum baseball bat, (7) three rolls of tape, and (8) a pair of brown gloves.[3]

In accordance with the court's earlier Rule 404(b) ruling, Robert testified as to prior bad acts that he had witnessed his co-conspirators commit, stating that, sometime between January and March 2004, Allen attempted to rob "Tanika" of drugs and money, whereby Allen was wearing a ski mask and had a gun and Robert was the driver. Robert also stated that, in February or March 2004, he watched Allen commit another armed and masked robbery for drugs and money, during which robbery Allen shot the victim in the hand. Robert testified that, in March 2004, (1) he learned from Allen and Frias that they, along with Garcia, had committed a robbery to obtain weapons and drugs; (2) they had shown him two of the weapons, and (3) these weapons were the ones recovered from the Dodge Durango.[4] Finally, Robert stated that, between April and May 2004, his brother,

---

[3] By stipulation, the government also proved that each co-conspirator had a prior conviction and, thus, had lost his right to possess a firearm.

[4] This prior bad act was not included in the government's Rule 404(b) notice. During trial, the government informed the district court, outside the jury's presence, that Robert had just informed the government that this additional act had occurred, and that the incident had been disclosed during discovery. The government then moved the court to excuse the government's lack of notice and allow testimony relating to this additional act into evidence. Allen conceded that this evidence had been disclosed during general discovery, but objected to testimony on it

Frias, and Garcia were involved in a robbery, during which they wore ski masks, carried a .380 caliber weapon, and stole cash and a lap-top computer.[5]

Additionally, on cross-examination, Robert testified that Allen had moved "when he violated probation." During a side-bar conference, Allen's counsel argued that he had not elicited this response and requested a mistrial because it was highly prejudicial. The government responded that no mistrial was warranted because Allen's counsel must have known the circumstances surrounding his own client's move when he asked Robert this question. The court ultimately denied this motion for a mistrial, concluding that this comment had not prevented Allen from receiving a fair trial.[6]

---

because it had not been included in the Rule 404(b) notice. The court overruled this objection, finding that, under these circumstances, the evidence was not a "surprise" to Allen and had not prejudiced the defendants. The court also discussed that the government had shown good cause for its failure to give pre-trial notice.

[5] The court instructed the jury that it could consider this Rule 404(b) evidence of uncharged prior bad acts only for the limited purpose of determining Allen's intent as to the charged conduct.

[6] Allen did not request, and the district court did not give, a curative instruction. Moreover, during the parties' closing statements, Allen's counsel made the following remarks:

> And what did - - what did Robert Allen do to dirty the character of Steven Allen? He says, "Oh no, he did live with me for a while but then he moved, or whatever because probation was looking for him." Well, is that prejudicial for that man to come in and talk about his brother being on probation? Is that suppose[d] to prejudice you against Steven Allen? Yes, he has a felony conviction, . . . but that doesn't mean, you know, that it was for an armed robbery or anything else like that. You don't know what it is, and you don't know if [the] felony conviction led him to being placed on probation. But he had a chance to burn him and he did. He dirtied up his brother by telling you he was on probation.

At the conclusion of the government's evidence, Garcia testified that he had never committed any robberies. Garcia stated that (1) he first met Agent McKean when he walked into the undercover warehouse; (2) Allen, who had been a good friend for three years, had told him that Robert had a way for them to make money quickly; and (3) he knew nothing about the robbery until he was sitting inside the warehouse. Garcia also explained the presence of firearms in his vehicle by stating that, when they left his house on June 22, he was told to put a bag in his vehicle, without knowing that the bag's contents. Garcia stated that, while waiting outside the warehouse, his girlfriend called him and told him to come home. When Garcia told the CI that he was going, the CI showed him the mask and gun inside the bag. Garcia became nervous and went inside to get Frias, but Robert told Garcia that he could not leave. Garcia also stated that Allen told him he could not leave, and that he previously was unaware of any robbery plans.

During closing statements, Allen's counsel argued as follows:

[T]hink about what the government did in this case to take this a bit too far. Remember, they manufactured this crime. It was McKean's plan and his idea, and it was obvious that he was a catalyst to move this so-called operation. And remember when . . . he was testifying and [the prosecutor] was asking him questions, he was answering [the prosecutor's] questions. But on cross-examination when the defense was scoring points, cross-examination of him, especially with Mr. Diaz[,] he kind of editorialized all of his answers and it was almost like a script when he was talking to you about what happened. He

10

wasn't talking to [the prosecutor], he was talking to you, and it was almost a change in personality when he gave those answers.

Garcia's counsel similarly argued that "[t]he prosecution, the government in the guise of Agent McKean made up this entire scenario, set it up with taxpayer's money, your money and my money." Similarly, Frias's counsel stated that "[Frias] is in trial because [the prosecutor] and Mr. McKean came up with an elaborate scheme on how to resolve this problem, and that is to take this young man and charge him with this crime and put him away for a long, long time."

The prosecutor, in turn, asserted during rebuttal closing statements:

The defendants went to that meeting planning to commit that drug rip-off robbery, and had there been a real stash house, had they been not given that opportunity there is no reasonable doubt they would have done so. And again, these gun[s] are certainly no figment of anything of Special Agent McKean's or anybody else's imagination. As far as the conduct of this case, the United States doesn't have any apologies. We don't - - and we submit that neither should Special Agent McKean. He did his job, and I think we now see the importance of that job, because God knows what could happen with the wrong people running around with weapons like that.

Immediately after the prosecutor made these comments, only Frias's counsel objected to them as "improper argument," and the court summarily overruled this

11

objection.[7]  The jury found Allen guilty on Count 1 and not guilty on Counts 2 and 3.  On the other hand, the jury acquitted Garcia and Frias on all counts.

Allen's presentence investigation report ("PSI") calculated his base offense level as 34, based on the offense involving at least 15 kilograms, but less than 50 kilograms of cocaine.  The PSI also increased this offense level by two levels, pursuant to U.S.S.G. § 2D1.1(b)(1), because a dangerous weapon was possessed, and by two levels, pursuant to U.S.S.G. § 3B1.1(c), because Allen was an organizer, leader, manager, or supervisor in the criminal activity, resulting in an adjusted offense level of 38.  Although Allen qualified as a career offender, however, his adjusted offense level of 38 was higher than the offense level indicated in the career-offender table in U.S.S.G. § 4B1.1(b); thus, his adjusted offense level served as his offense level.

With a total offense level of 38 and a criminal history category of VI,[8] Allen's resulting guideline range was 360 months' to life imprisonment.  However, because Allen's sentence could not exceed his statutory maximum sentence of 360 months' imprisonment, pursuant to U.S.S.G. § 5G1.1(c)(1), his statutory maximum

_____

[7] None of the parties asked for a mistrial based on this alleged prosecutorial misconduct. Moreover, the court instructed the jury during its jury charge that the counsel's arguments did not constitute evidence.

[8] With a total of 15 criminal-history points, Allen had a criminal history category of VI, regardless of his status as a career offender.

sentence became his guideline range. Allen argued in his objections to this PSI that (1) he only should be held accountable for five kilograms of cocaine—the amount proved during his trial; (2) he should not be assessed an enhancement for possessing a firearm when he was acquitted on the firearm offenses; and (3) he should not receive a two-level enhancement based on his role in the offense.

On April 31, 2005, at sentencing, when Allen renewed these objections to his PSI, the district court sustained his first two objections. On his remaining objection to the § 3B1.1(c) role enhancement, Allen argued that the trial evidence established that (1) Robert was the leader and organizer of the robbery, (2) Robert gave Allen directions, and (3) all of the participants were abusing drugs. The government responded that this enhancement was warranted because Allen recruited persons needed to conduct the robbery, that is, Frias and Garcia, and that these recruited persons supplied the firearms that the co-conspirators intended to use during the robbery. The court, however, overruled Allen's objection to his role enhancement based on the trial testimony. Because Allen was a career offender, his offense level was 34, his criminal history category was VI, and he had a resulting guideline range of 262 to 327 months' imprisonment.

The government then argued that Allen should be sentenced to 360 months' imprisonment, a sentence outside of his advisory guideline range, because:

13

(1) Allen had an extensive criminal history, (2) he committed this offense while he was on probation for another offense, and (3) he was a danger to society. Allen, in turn, (1) offered his mother's testimony that he had a difficult life, and (2) Garcia's testimony that Robert had manipulated Allen. Allen also argued that the court should sentence him to a sentence equal to, or less than, Robert's 188-month sentence because Robert had turned him into a drug addict and manipulated him.

After considering the PSI's contents, the parties' arguments, and the sentencing factors in 18 U.S.C. § 3553(a), the court determined that a sentence at the high end of Allen's guideline range, that is, 327 months' imprisonment, was appropriate. The court specifically explained that this sentence reflected the seriousness of the offense, Allen's extensive criminal history, and his "overall pattern of criminality." Allen's counsel raised no additional arguments after the court's imposition of its sentence.

**Issue 1:      Admission of evidence of three prior uncharged extrinsic bad acts**

Allen argues that the district court abused its discretion in admitting evidence of the three prior uncharged extrinsic bad acts that were included in the government's Rule 404(b) notice because these acts involved different intents than the charged offense of conspiracy to possess with intent to distribute cocaine. Allen also asserts that Robert's testimony on these acts should not have been

admitted because, although the uncorroborated word of an accomplice may be sufficient to admit Rule 404(b) evidence, Robert denied being an accomplice. Allen contends that the probative value of this evidence was "clearly outweighed" by its prejudicial impact because, even without this evidence, the government presented a strong case as to his intent. Finally, Allen argues that this error was not harmless when (1) the defense argued that the government manufactured this conspiracy, (2) the defense attacked the government's corroborating evidence, and (3) Allen's post-arrest statement was not recorded.

Rule 404(b) provides in relevant part that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . ..

Fed.R.Evid. 404(b). Our test for admissibility of Rule 404(b) evidence is as follows:

First, the evidence must be relevant to an issue other than the defendant's character; Second, the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; Third, the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403.[9]

_____

[9] Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation

United States v. Matthews, 431 F.3d 1296, 1310-11 (11th Cir. 2005) (quotation omitted). The decision to admit or exclude such evidence is reviewed for abuse of discretion. Id. at 1311.

In applying the first "relevancy" element of this Rule 404(b) test, we have explained that Rule 404(b) is a "rule of inclusion." United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003); see also United States v. Stephens, 365 F.3d 967, 975 (11th Cir. 2004) (because Rule 404(b) allows evidence "unless it tends to prove only criminal propensity," the list provided by the rule "is not exhaustive"). We also have discussed that "[o]ne of the elements of conspiracy that the prosecution must establish beyond a reasonable doubt is an intention to further the purposes of the conspiracy." United States v. Perez, No. 05-12404, slip op. at 1699 (11th Cir. March 21, 2006). When a defendant charged with a conspiracy enters a plea of not guilty, he makes intent a material issue. Id.; see also Matthews, 431 F.3d at 1311 (reiterating that a "plea of not guilty, without an accompanying affirmative removal, [makes] intent a material issue").

The challenged Rule 404(b) conduct here, similar to the charged conspiracy, involved the co-conspirators' robbing persons, including drug dealers, using firearms and ski masks to obtain drugs and money. This evidence, therefore, was

---

of cumulative evidence." See Fed.R.Evid. 403.

16

relevant to establish the co-conspirators' intent, which they placed at issue by pleading not guilty. See United States v. Ramirez, 426 F.3d 1344, 1354 (11th Cir. 2005) (explaining that "[a] similarity between the other act and the charged offense will make the other offense highly probative with regard to a defendant's intent in the charged offense"). Moreover, this Rule 404(b) conduct occurred from January through May 2004, within the same six-month period as the charged conduct in June 2004. Thus, instead of constituting improper character evidence, this Rule 404(b) evidence was relevant as evidence of knowledge and intent. See Perez, No. 05-12404, slip op. at 1699.

Applying the second element of this Rule 404(b) test, "the uncorroborated word of an accomplice . . . provides a sufficient basis for concluding that the defendant committed extrinsic acts admissible under Rule 404(b)." United States v. Dickerson, 248 F.3d 1036, 1047 (11th Cir. 2001). In Dickerson, we concluded that testimony by the supplier of the defendant's subsequent cocaine purchases provided sufficient proof of the extrinsic act. See id. Similarly, in establishing the Rule 404(b) evidence at issue here, the government introduced co-conspirator Robert's eyewitness testimony as to the Rule 404(b). Moreover, even if we were to conclude that Robert was not an accomplice, based on his denial of involvement in this Rule 404(b) conduct, the government introduced as corroborating evidence

17

Allen's concession during his post-arrest statement that he had committed prior robberies. Thus, this Rule 404(b) conduct also had a sufficient basis in the record.

Finally, in determining under the Rule 403 analysis whether this probative value was outweighed by its prejudicial impact, a district court must apply "a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." See Jernigan, 341 F.3d at 1282 (internal marks and quotation omitted). We, however, consider the evidence "in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." Id. at 1284 (quotation and marks omitted). Indeed, we have explained that, even when this balancing test is close, "it is precisely these close questions that give rise to the deferential abuse of discretion standard of review." Id. at 1285. Additionally, a district court's limiting instruction can reduce the risk of undue prejudice. Ramirez, 426 F.3d at 1354.

Here, the court demonstrated that it conducted this Rule 403 inquiry by excluding evidence of two prior bad acts, based on the court's determination that the prejudicial effect from the violence underlying these acts outweighed their probative value. As discussed under the relevancy prong, the remaining Rule 404(b) evidence involved similar conduct, as well as occurring within the same

18

six-month period.  See Jernigan, 341 F.3d at 1282.  Moreover, although the government introduced as proof of the conspiracy Agent McKean's testimony and Allen's own concessions during his post-arrest statement, this additional Rule 404(b) evidence of intent was needed in light of the facts that none of the corroborating physical evidence was recovered from the co-conspirators' persons; co-conspirator Garcia explicitly testified that he lacked the intent to join the conspiracy; and all of the co-conspirators at least implied during closing statements that the undercover government agents in the conspiracy unduly influenced the co-conspirators.  The court also properly instructed the jury that it could consider this evidence of uncharged prior bad acts only for the limited purpose of determining Allen's intent as to the charged conduct.  The court, therefore, did not abuse its discretion in admitting this Rule 404(b) evidence.

**Issue 2:**      **Admission of evidence of a fourth uncharged extrinsic bad act when the government failed to provide pre-trial notice**

Allen also argues that the district court erred in admitting evidence of a fourth extrinsic bad act, that is, Agent McKean's and Robert's testimony that Allen "and others" recovered two of the weapons that were ultimately recovered from the Dodge Durango in the instant case, where the government failed to provide proper pre-trial notice of this evidence.  Allen contends that "good cause" was not shown for this failure because the government should have known about this evidence

19

pre-trial and properly disclosed it to Allen. Allen also asserts that he was prejudiced by this error because this additional Rule 404(b) evidence corroborated Agent McKean's previously uncorroborated testimony relating to Allen's admissions during his post-arrest interrogations.

Rule 404(b) provides that the government "shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown," of "the general nature of any such [Rule 404(b)] evidence it intends to introduce at trial." Fed.R.Evid. 404(b). This notice rule requires "the prosecution to provide notice, regardless of how it intends to use the extrinsic act evidence at trial." United States v. Carrasco, 381 F.3d 1237, 1240 (11th Cir. 2004) (quotation omitted), cert. denied, 543 U.S. 1177 (2005). Indeed, the policy behind Rule 404(b)'s notice requirement is "to reduce surprise and promote early resolution on the issue of admissibility." Id. at 1241 (quotation omitted).

In Carrasco, the government failed to give the defendant notice of evidence of either drug dealings between the defendant and the witness, or the defendant's alleged operation of a tire business as a front for his drug operations. See id. Moreover, the government did not assert that it had newly discovered this evidence during the course of the trial. See id. at 1241 n.4. We, therefore, concluded that the district court's admission of this evidence was erroneous. See id. at 1241.

Additionally, after determining that this evidence of the defendant's intent "went to the heart of" the defendant's defense, and that prejudice to the defendant was compounded by the fact that the district court did not permit the defendant to re-open his case to address this testimony, we concluded that the government's failure to provide the required Rule 404(b) notice was not harmless and that remand was necessary. See id. at 1241.

On the other hand, in the instant appeal, the prosecutor, before attempting to introduce this evidence, notified the district court, albeit after the trial had commenced, that he had just learned about this additional Rule 404(b) conduct while generally discussing with Robert his testimony. The prosecutor also contended that this conduct had been disclosed through other discovery. Indeed, although Allen renewed his objection to the evidence based on his argument that it had not been included in the Rule 404(b) notice, Allen conceded that this evidence had been disclosed during general discovery. Thus, the district court did not err in concluding that the government had shown good cause for its failure to give pre-trial Rule 404(b) notice as to this conduct and this procedural violation of Rule 404(b) had not prejudiced the defendants. See Carrasco, 381 F.3d at 1241 (discussing Rule 404(b)'s policy goal of reducing surprise).

21

Alternatively, we conclude that any error was harmless. See United States v. Jiminez, 224 F.3d 1243, 1250 (11th Cir. 2000) (explaining that "[a]n erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless"). In Jiminez, we determined that no reversible error occurred in the admission of evidence of spousal abuse where the government presented substantial alternative evidence establishing the defendant's guilt. See id. Similarly, in the instant case, the government presented significant evidence on Allen's conspiracy count, including tape-recorded meetings between Agent McKean and the co-conspirators and Allen's own post-arrest admissions. Moreover, as discussed in Issue 1, the court gave the jury limiting instructions as to the Rule 404(b) evidence. See United States v. Stone, 9 F.3d 934, 938 (11th Cir. 1993) (explaining that juries are presumed to follow instructions given to them by trial courts). Indeed, the jury's acquittal of Frias and Garcia, who also were allegedly involved in two of the prior bad acts, and the jury's acquittal of Allen on his remaining two counts, demonstrated that the jury was able to follow the court's limiting instruction. Thus, if any error occurred, it was harmless.

**Issue 3:      Denial of Allen's motion for a mistrial**

Allen argues that, although the jury later learned that he had at least one prior felony conviction, testimony that he currently was on probation

22

"inappropriately highlighted [his] past contact with the criminal justice system."

Allen asserts that informing the jury that he was on probation was akin to showing

them a "mug shot" because this evidence "carries the clear implication of criminal

activity and breaches the rule against admitting evidence of defendant's bad

character." Allen also summarily argues that he was denied a fair trial.

We review a district court's denial of a motion for a mistrial for abuse of

discretion. Ramirez, 426 F.3d at 1353. We have explained that this discretion

exists because the trial judge "is in the best position to evaluate the prejudicial

effect of improper testimony." United States v. Perez, 30 F.3d 1407, 1410 (11th

Cir. 1994). Thus, the abuse-of-discretion standard generally allows "a range of

choice for the district court, so long as that choice does not constitute a clear error

of judgment." United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004)

(quotation omitted).

Here, Robert testified during cross-examination that Allen had to move

"when he violated probation." During a side-bar conference, Allen's counsel

argued that he had not elicited this response and requested a mistrial because it was

highly prejudicial, which the district court denied. However, this comment relating

to Allen being on probation was isolated. See United States v. Funt, 896 F.2d

1288, 1295 n.5 (11th Cir. 1990) (explaining that we generally uphold a district

23

court's refusal to grant a mistrial where the comments presented to the jury were "spontaneous and singular"). The jury also was aware, via the parties' stipulation, that Allen was a convicted felon. Additionally, as discussed in Issue 2, the government presented significant evidence on Allen's conspiracy count, including tape-recorded meetings between Agent McKean and the co-conspirators and Allen's own post-arrest admissions. See Perez, 30 F.3d at 1411 (explaining that "[i]mproper and prejudicial testimony is less likely to mandate a mistrial when there is other significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact upon the verdict of the jury") (quotations omitted). Thus, the district court did not abuse its discretion in denying Allen's motion for a mistrial.[10]

**Issue 4:    Remarks made by the prosecutor during closing statements**

Allen argues that the prosecutor's comments during rebuttal closing statements, which related to the importance of Agent McKean's job and the dangers from letting people like Allen "run[] around with firearms," constituted "foul blows." Allen asserts that these comments improperly "invited the jury to

---

[10] We note that, "[w]hen a curative instruction has been given to address some improper and prejudicial evidence, we will reverse [a district court's denial of a motion for a mistrial] only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition." See Perez, 30 F.3d at 1410 (quotation omitted). Here, however, Allen did not request, and the court did not give, a curative instruction.

24

judge the case upon standards and grounds other than the evidence and the law of the case." Allen also contends that this error is reversible error because (1) these comments were immaterial to guilt or innocence, (2) he was prejudiced by them because they shifted the jury's focus from the evidence to emotion, and (3) the court did not give a curative instruction.

"A prosecutor is forbidden to make improper suggestions, insinuations and assertions calculated to mislead the jury and may not appeal to the jury's passion or prejudice." United States v. Rodriguez, 765 F.2d 1546, 1560 (11th Cir. 1985) (quotation and marks omitted). Whether prosecutorial statements, which were objected to at trial, violated due process is a mixed question of law and fact that we review de novo. United States v. Baker, 432 F.3d 1189, 1252 (11th Cir. 2005), cert. denied, (U.S. April 17, 2006) (No. 05-9687).[11] We will reverse a defendant's conviction based on a prosecutor's statements when they were: (1) improper, and (2) prejudiced the defendant. Id. Improper statements prejudice the defendant when there is "a reasonable probability that, but for the prosecutor's offending remarks, the outcome of the . . . [proceeding] would have been different. [A]

_____

[11] If we were to conclude that an objection by Allen's co-conspirator to the prosecutor's comments was not sufficient to preserve Allen's argument for appeal, our review of these comments only would be for plain error, see United States v. Rodgers, 981 F.2d 497, 499 (11th Cir. 1993). Plain error is "error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity and public reputation of judicial proceedings." See id. (quotations omitted).

reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991)).

In Baker, the defendants claimed that the prosecutor improperly (1) bolstered witness testimony, (2) commented on the defendants' right to remain silent, (3) asked the jury to act as the "conscience of the community" by returning guilty verdicts, and (4) asked the jury to convict the defendants based on their bad character. See id. After examining whether any of the prosecutor's challenged statements were improper and reviewing their prejudicial effect in the aggregate, we concluded that the statements, when read in context, were "merely permissible discussions of the evidence presented at trial, the prosecutor's credibility arguments, and the prosecutor's arguments that the evidence ha[d] shown the defendants' guilt." See id.

In the instant appeal, the prosecutor commented during his rebuttal closing statements that, "[a]s far as the conduct of this case, the United States doesn't have any apologies. We don't - - and we submit that neither should Special Agent McKean. He did his job, and I think we now see the importance of that job, because God knows what could happen with the wrong people running around with weapons like that." Although these comments arguably were improper if

26

viewed in isolation, see United States v. Cole, 755 F.2d 748, 768-69 (11th Cir. 1985) (holding that it was improper to say "[i]t is a very important case for the government"), they were in reply to comments the co-conspirators' counsel made during closing statements challenging the "reverse sting" investigation. Prosecutor's remarks, although otherwise improper, may be permissible when they are in reply to statements of defense counsel. See Rodgers, 981 F.2d at 499-500 (concluding that the challenged comments were permissible as replies to comments the defendant's counsel had made during opening and closing statements).

Additionally, the district court instructed the jury that the lawyer's statements were not evidence. See United States v. Herring, 955 F.2d 703, 710 (11th Cir. 1992) (explaining that "prosecutorial misconduct may be rendered harmless by curative instructions to the jury"). Allen's contention that these comments prejudiced him also is belied by the fact that the jury acquitted him on the other two counts in his superseding indictment, as well as acquitting his two co-conspirators as to all charges. See Rodriguez, 765 F.2d at 1560 (discussing that the defendant's acquittal on one of the counts was "telling proof that he was not prejudiced by the prosecutor's remarks"). Thus, the prosecutor's challenged comments during his rebuttal statements were not erroneous, plainly or otherwise.

27

**Issue 5:** **Allen's sentence**

Allen last challenges his 327-month sentence, arguing that the district court's application of a two-level § 3B1.1(c) enhancement for leadership role in calculating his offense level was not supported by the evidence. Allen also contends that, after calculating his advisory guideline range, the court imposed an unreasonable sentence at the top of this range because this sentence resulted in an unwarranted sentencing disparity among the convicted co-conspirators. Allen asserts that, instead, he should have received Robert's 193-month sentence, or a sentence at the bottom of his guideline range, that is, 262 months' imprisonment.

Prior to Allen's sentencing hearing, the Supreme Court issued its decision in Booker, holding that the mandatory nature of the federal guidelines rendered them incompatible with the Sixth Amendment's guarantee to the right to a jury trial. Booker, 543 U.S. at 232-35, 125 S.Ct. at 749-51.[12] In a second and separate majority opinion, the Booker Court explained that, to best preserve Congress's intent in enacting the Sentencing Reform Act of 1984, the appropriate remedy was to "excise" two specific sections—18 U.S.C. § 3553(b)(1) (requiring a sentence

---

[12] The Supreme Court in Booker explicitly reaffirmed its rationale in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." See Booker, 543 U.S. at 244, 125 S.Ct. at 756.

28

within the guideline range, absent a departure) and 18 U.S.C. § 3742(e) (establishing standards of review on appeal, including <u>de novo</u> review of departures from the applicable guideline range)—thereby effectively rendering the federal guidelines advisory only.  <u>Id.</u> at 258, 125 S.Ct. at 764.  Thus, the <u>Booker</u> Court concluded that a defendant's guideline range is now advisory; it no longer dictates his final sentence, but, instead, is an important sentencing factor that the sentencing court is to consider, along with the factors contained in 18 U.S.C. § 3553(a).[13]  <u>Id.</u> at 259-60, 125 S.Ct. at 764-65.

Under <u>Booker</u>, we review a defendant's ultimate sentence for reasonableness.  <u>United States v. Talley</u>, 431 F.3d 784, 785 (11th Cir. 2005). Although the federal guidelines now are only advisory, however, courts "remain[] obliged to 'consult' and 'take into account' the [g]uidelines in sentencing," and the guidelines "remain an essential consideration in the imposition of federal

---

[13] The relevant sentencing factors enumerated in § 3553(a) include: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed–(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for . . . (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .; (5) any pertinent policy statement []; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense." <u>See</u> 18 U.S.C. § 3553(a)(1)-(7).

sentences, albeit along with the factors in § 3553(a)." United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005). Thus, before deciding whether a sentence is reasonable, we must determine whether the district court correctly interpreted and applied the federal guidelines in calculating the defendant's guideline range. Id. (noting that "the district court remains obligated to 'consult' and 'take into account' the [g]uidelines in sentencing"). Moreover, "[t]he district court's interpretation of the [federal guidelines] [still] is subject to de novo review on appeal, while its factual findings must be accepted unless clearly erroneous." United States v. Williams, 435 F.3d 1350, 1353 (11th Cir. 2006) (internal quotation and marks omitted).

To the extent Allen is arguing that the district court erred in applying a § 3B1.1(c) enhancement based on his role in the offense, the government has responded that this argument is moot because Allen's total offense level was determined by his status as a career offender. Indeed, the guidelines provide that a defendant who is a career offender,[14] is convicted of a controlled substance felony offense, and faces a statutory maximum 30-year sentence under § 841(b)(1)(C),

---

[14] A defendant is a "career offender" if: (1) the defendant was at least 18 years old at the time of the offense; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. See U.S.S.G. § 4B1.1(a).

such as Allen, should have his offense level set at 34. See U.S.S.G. § 4B1.1(b)(B) (setting base offense level for career offender who committed an offense with a statutory maximum sentence of 25 years or greater). Thus, even if the court had not applied a § 3B1.1(c) enhancement to Allen's base offense level of 30, Allen still would have had a resulting offense level of 34 under § 4B1.1(b)(B), and this Court need not examine whether the enhancement was applied in error. See United States v. Rice, 43 F.3d 601, 608 n.12 (11th Cir. 1995) (explaining that, where a minimum mandatory life sentence superseded the defendant's guideline range, we were not required to determine whether the district court erred in calculating the defendant's base offense level).

Furthermore, to the extent Allen is contending that his 327-month sentence was unreasonable in comparison to co-conspirator Robert's 188-month sentence, after a district court has calculated a defendant's advisory guideline range, it "may impose a more severe or more lenient sentence," as long as it is reasonable. See Crawford, 407 F.3d at 1179. The party who is challenging the sentence "bears the burden of establishing that the sentence is unreasonable in the light of both [the] record and the factors in [§ 3553(a)]." Id. at 1178. In reviewing for reasonableness, we do not apply the reasonableness standard to each individual

decision made during the sentencing process, nor do we, as the district court did, determine the exact sentence to be imposed.  Id.

After considering the sentencing factors in § 3553(a), the district court determined that a sentence at the high end of Allen's advisory guideline range, that is, 327 months' imprisonment, was appropriate.  The court explained that this sentence reflected the seriousness of the offense, Allen's extensive criminal history, and his "overall pattern of criminality."  See 18 U.S.C. § 3553(a)(1) ("the history and characteristics of the defendant"); 18 U.S.C. § 3553(a)(2)(A) (the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense).

Indeed, the charged conspiracy in the instant case involved the plan to kill the security guard at the "stash house," using a .38 caliber revolver and a .45 caliber pistol, and to steal kilogram amounts of cocaine.  Allen's PSI also reflected that, with a total of 15 criminal-history points, he had a criminal history category of VI, regardless of his status as a career offender.  Moreover, to the extent Allen is contending that his sentence resulted in a sentencing disparity among the co-conspirators because Robert only received a 188-month sentence, Robert, who plead guilty and agreed to cooperate with the government, including testifying during Allen's trial, was not similarly situated.  See United States v. Regueiro, 240

32

F.3d 1321, 1325-26 (11th Cir. 2001) (explaining that disparity between sentences imposed on codefendants generally is not an appropriate basis for challenging the district court's denial of a motion to depart downward under U.S.S.G. § 5K2.7).[15]

Thus, Allen has failed to show that the court did not consider § 3553(a)'s sentencing factors, or that his 327-month sentence was unreasonable. See Talley, 431 F.3d at 788 (explaining that, although a sentence within a defendant's advisory guidelines range is not per se reasonable, ordinarily we "would expect a sentence within the [g]uideline range to be reasonable").

Accordingly, we conclude that the district court did not commit reversible error in admitting evidence of prior uncharged extrinsic bad acts, denying Allen's motion for a mistrial, or in overruling an objection to remarks made by the prosecutor during closing statements. Furthermore, we conclude that Allen's career-offender sentence rendered moot his challenge to the § 3B1.1(c) enhancement and that his 327-month sentence was reasonable. We, therefore, affirm Allen's conviction and sentence.

**AFFIRMED.**

---

[15] Again in the context of reviewing the denial of a § 5K2.7 departure motion, we have explained that, "to adjust the sentence of a co-defendant in order to cure an apparently unjustified disparity between defendants in an individual case will simply create another, wholly unwarranted disparity between the defendant receiving the adjustment and all similar offenders in other cases." See United States v. Chotas, 968 F.2d 1193, 1198 (11th Cir. 1992).