Rel: May 3, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

_____

## CR-2022-0546

_____

**Brandon Dewayne Sykes**

**v.**

**State of Alabama.**

**Appeal from Lamar Circuit Court**
**(CC-19-144)**

PER CURIAM.

Brandon Dewayne Sykes appeals his capital-murder convictions and his sentence of death. Sykes was convicted of murder made capital for intentionally killing Keshia Nicole Sykes during a first-degree burglary, see §13A-5-40(a)(4), Ala. Code 1975, for intentionally killing

Keshia Nicole Sykes during the commission of a first-degree kidnapping, see § 13A-5-40(a)(1), Ala. Code 1975, and for intentionally killing Keshia Nicole Sykes during the commission of a first-degree robbery, see § 13A-5-40(a)(2), Ala. Code 1975. The jury unanimously sentenced Sykes to death.

Facts

Sykes and Keshia were married from May 2012 to May 2014, and they had two children together during the marriage, a son named Bron and a daughter named Brooklyn. The divorce had been contentious, with Keshia being awarded custody of their children amidst allegations that she had been abused by Sykes. Sykes was unhappy with the court's custody determination, and he was particularly incensed by Keshia's living with and becoming engaged to Drapher Bonman, who at the time had a pending charge for a sex offense against a minor. Sykes had already refused to return Bron to Keshia following a visitation period, and he sought to obtain custody of Brooklyn, as well. On February 8, 2015, Sykes attempted to report to Lt. Steve Thompson of the Vernon Police Department that Keshia had imperiled their daughter's safety by living with Bonman. Lt. Thompson encouraged Sykes to take the

2

information to the attorney handling his domestic case. Sykes agreed but stated to Lt. Thompson, "'If the court won't help get my kids back, then I'll do whatever I have to do to get them back.'" (R. 896.)

On February 18, 2015, Keshia moved out of Bonman's house and into a house next door to her parents. That night, though, Bonman spent the night with Keshia in her new home. Around 7:20 a.m. the following morning, Keshia's mother, Kathleen Nalls, called Keshia on her way to work. Keshia told her mother that she and Brooklyn were watching television at home. Nalls testified that when she arrived at work, she noticed Sykes sitting in his truck in a parking lot across the street. Nalls went inside and peered through a window. She saw Sykes leave the parking lot in his truck.

Nalls attempted to contact Keshia later that morning but was unsuccessful, and Nalls learned that Keshia had failed to pick up Nalls's sister as scheduled. Nalls telephoned a nephew who lived with her and asked him to look for Keshia's vehicle, a silver Honda owned by Bonman that Keshia was using at the time. Her nephew told Nalls that the vehicle was not at Keshia's house.

After work Nalls went to Keshia's house. Upon entering, Nalls saw that there was blood throughout the residence, that a bedroom window had been shattered, and that several of Keshia's possessions, such as her vehicle, wallet, and cell phone, were missing. Nalls also noticed that a bedspread and several rugs had been removed from the house. Neither Keshia nor Brooklyn were at the home.

Chief Davy Eaves of the Vernon Police Department responded to the emergency call about the state of Keshia's house. In the kitchen, Chief Eaves saw bloodstains and smears throughout – on the back door, on the floor, on the counter, and on the appliances. A rag covered in blood sat on the kitchen table, and there was a mop in the corner that appeared to have bloodstains. The mop was still damp, according to Chief Eaves. Chief Eaves stated that he accidentally bumped a chair in the kitchen while taking pictures of the scene; when the chair moved, one of the feet left a streak of blood on the floor from blood that had pooled underneath it. Chief Eaves testified that it "looked like something had happened that somebody had tried to clean it up." (R. 743.) Chief Eaves noted a bloody footprint in the living room along with substantial bloodstains on the carpet in the house. Chief Eaves stated that blood had "soaked

4

completely through the carpet padding and had pooled on the cement floor." (R. 757.) Outside the house, Chief Eaves photographed drops of blood in the yard and recovered a small, frozen piece of flesh lying in the grass. Subsequent genetic testing revealed that the piece of flesh and much of the blood found inside of and outside the house were from Keshia. Also, a mixture of genetic profiles was found on the handle of the bloodstained mop, and Sykes could not be excluded as a potential contributor to the minor component of this sample.

Brooklyn was located at the home of Sykes's sister, Lekeshia Sykes. Lekeshia told investigators that Sykes had dropped off his son at her house around 6:15 a.m. that day and that Keshia had sent her a text message around 11:15 a.m. asking her if she could babysit Brooklyn. Lekeshia told investigators that Keshia had arrived with Brooklyn about 15 minutes after she sent the text message.

Bonman arrived at Keshia's house while officers were assessing the scene. According to Bonman, he had left Keshia's house around 5:00 a.m. on February 19 and that, although he had attempted to call her during the day, he had not spoken to her since he left the house.

5

Sykes agreed to be interviewed at the Vernon Police Department on the night of Keshia's disappearance. Sykes told officers that he had not been in contact with Keshia during the previous week. Sykes stated that he had dropped off his son Bron with his sister Lekeshia around 6:30 a.m. and then went to work at Wheeler Automotive body shop, where he remained until 3:00 p.m. After work, he drove to Lekeshia's house and stayed until 5:00 p.m. with Bron and Brooklyn. While Sykes was giving his statement, Lt. Thompson conducted a consensual search of Sykes's truck. Lt. Thompson scraped and collected what appeared to be two droplets of dried blood in the back of Sykes's truck. Subsequent genetic testing established that the blood was Keshia's.

On February 23, Inv. Keith Cox with the Pickens County District Attorney's Office was notified by law enforcement in Mississippi that Keshia's vehicle may have been located. Inv. Cox went to an address in Lowndes County, Mississippi; two mobile homes, which appeared to be vacant, sat on the property. Keshia's burned-out vehicle was found behind the mobile home on the right. Inv. Cox found a flashlight about 10 yards from the vehicle and three red gas cans – one in front of the mobile home to the right and two more inside the mobile home to the left.

Officers collected several cell phones from Sykes. The data extracted from the cell phones, and the people to whom that data led, challenged Sykes's assertion to investigators that he had been at Wheeler Automotive all day on February 19. For instance, Sykes spoke on the phone several times with Benjamin Scott, an acquaintance of Sykes, between 6:59 a.m. and 9:38 a.m. on February 19. Scott testified that he often performed odd jobs for Sykes in exchange for drugs. On February 19, Sykes asked Scott to photograph Bonman's house and to then come to Wheeler Automotive. Scott arrived at the body shop and Sykes asked for a ride. Sykes directed Scott on a circuitous route around town before directing him to drive by the house of Keshia's parents.[1] Scott was instructed to stop his vehicle approximately 100 yards beyond the house. Sykes told Scott he would call him, and he then got out of the vehicle, running to a wooded area next to Keshia's house.

Scott drove to his girlfriend's house and waited. At some point, Scott answered a telephone call from a number he did not recognize. It was Sykes; Scott testified that Sykes sounded as though he were out of

---

[1] Scott was not aware that Keshia had moved into the house next door.

7

breath and that he could hear a child crying in the background. Sykes told Scott to meet him at Lekeshia's house; Scott drove to the house but did not stop. Scott explained: "I [didn't] stop because I thought he's done kidnapped his baby or something. And I didn't want to get in the middle of [that]." (R. 1076-77.) Scott next heard from Sykes later that evening. Scott went by Sykes's house and picked up methamphetamine as payment for his assistance that day. Scott called him two days later to ask for methamphetamine with a promise to pay Sykes later. Sykes agreed, warning him, "'You don't want to get on my bad side. That's the first time I killed in a long time.'" (R. 1081.)

Sykes's telephone records indicated he called his cousin Eric Blevins at 10:31 a.m. on February 19. Sykes asked Blevins if he knew of a good body of water in which to sink a vehicle. Sykes explained that he wanted to dispose of a vehicle for insurance purposes. Blevins testified that he told Sykes that he did not know where to sink a car.

Luther Hackman, Sykes's cousin who lived in Columbus, Mississippi, received a call from Sykes at 10:56 a.m. on February 19. Sykes told him he "just needed to park a car." (R. 1134.) Sykes described the vehicle as a "silver or gold Honda" that belonged to "his wife's

boyfriend." (R. 1135-36.) Sykes arrived around noon and parked the Honda in Hackman's backyard, which was surrounded by a high fence. Hackman then drove Sykes back to Wheeler Automotive.

Hackman saw Sykes the following day when Sykes returned to retrieve the Honda. Sykes told Hackman that "he wasn't going to let them raise his kids 'cause whoever the guy was, he was a child molester and [Keshia] was beating on his kids and … wasn't letting him see … the kids." (R. 1140-41.) As Sykes walked to the Honda, Hackman noticed that Sykes was carrying a lighter and a small gas can. Sykes asked Hackman to follow him in his own vehicle and to pick him up after he abandoned the Honda; Hackman agreed. Sykes left Hackman's property and drove for a few minutes before turning down a gravel road. Hackman drove beyond the gravel road for a few miles and then turned around. As he came back, Sykes was walking down the road. Sykes got in Hackman's vehicle, and Hackman drove Sykes back to Vernon. Geolocation tracking of Sykes's cell phone supported Hackman's testimony regarding Sykes's trips to Columbus.

On March 29, 2015, Lekeshia sought out Lt. Thompson to amend her prior statement that Keshia had brought Brooklyn to her house on February 19:

> "What actually happened that day was that at around 9:00 a.m., [Sykes] showed up with no prior notice with Brooklyn and gave me Brooklyn and told me, 'If anybody asks, Keshia brought her.' … At 11:15, I received a text message that asked, 'Can you keep Brooklyn?' I didn't recognize the number at first, and sent back a text asking, 'Who is this?', but then I remembered it was Keshia Sykes's old number …. Right after I sent the text, [Sykes] called me from his 2300 phone number and said, 'Just play along.' … I then sent a text back to Keshia's phone that said, 'Yes, I'll keep her,' and a text came back, 'I'll bring her in a minute.' I don't know if [Sykes] was sending the text from Keshia's phone or if Keshia was with [Sykes] and using the phone herself at this time. … [A]round 5:00 p.m., [Sykes] told me to send Keshia a text and ask about bringing Brooklyn back to her."

(R. 1119.) Keshia told Lt. Thompson that she realized lying in her previous statement was "a very serious matter" but that she had been afraid of the reaction from her family had she been truthful.

Investigators were able to tie Sykes to Keshia's missing cell phone. A month or so after Keshia's disappearance, Nalls noticed activity on her cellular billing statement from Keshia's cell phone. Nalls reported the activity, and this led investigators to Christy Sanderson, who relinquished the cell phone to investigators and stated that she had

bought the cell phone from Lois Gibson. Gibson testified that she had acquired the cell phone on March 8 when she visited Sykes's house with a mutual friend. Gibson saw several cell phones in the living room of Sykes's house, and, as she was leaving, she stole one – a white, LG brand cell phone. Gibson then sold the cell phone to Sanderson. Gibson later received a telephone call from an unknown number; a female on the line told Gibson that she was "'the sister of the guy whose house you stole the phone from. It's my phone, and I want it back.'" (R. 1269.) Gibson also received text messages demanding that the cell phone be returned; these text messages were sent from a cell phone law enforcement eventually collected from Sykes. At trial, Gibson identified Keshia's cell phone as the cell phone that she had stolen from Sykes.

Sykes was arrested on April 9, 2015. The next day, Sykes gave a statement to Agent Andy Jones with the Alabama Bureau of Investigation. Sykes told Agent Jones that investigators had a misapprehension about Keshia's disappearance. Sykes explained that at the time of his divorce from Keshia, he "was running money and drugs for the cartel out of Memphis and sometimes he would loan the car to them, sometimes he would drive it himself." (R. 1441.) Sykes stated

11

Keshia was embittered about not being awarded Sykes's vehicle in the divorce proceedings. On one occasion when Keshia was aware of cartel members using Sykes's vehicle, Keshia spitefully contacted the Memphis office of the Drug Enforcement Administration and provided federal agents with the location of Sykes's vehicle. Sykes told Agent Jones that Keshia's tip led to the arrest of 3 cartel members and the seizure of 40 pounds of marijuana, 2 bricks of cocaine, $280,000, and his vehicle.[2]

According to Sykes, he and Keshia soon afterwards resumed their relationship. The rekindled romance ended in January 2015, though, and Keshia began living with Bonman. Agent Jones continued:

> "[Sykes] said that Keshia had an addiction to [methamphetamine]; and before she left Sykes, she found a flip phone that he had that he used strictly for making deals with the cartel in Memphis.
>
> "He said he had it hid inside a stuffed animal in the kids' room and Keshia had found it and took it with her when she moved in with Bonman[. Keshia] used this flip phone to set up a purchase of [methamphetamine] with the cartel in Jasper and Bonman provided her with some currency and some – counterfeit currency to make the purchase.
>
> "And [Sykes] said that Keshia and Bonman put the actual real currency on top and the fake currency on the bottom, made the purchase of the drugs and by the time the

---

[2] The Drug Enforcement Administration had no record of this alleged arrest and seizure.

12

cartel found out that it was fake currency, that she'd already left with the drugs.

"So [Sykes] said he got a call from a cartel member telling [Sykes] he owed [the cartel member] $20,000."

(R. 1442-43.) Sykes denied any responsibility for Keshia's actions, and, according to Sykes, the cartel "wanted their money or her." (R. 1443.) Sykes offered them Keshia. Sykes admitted to Agent Jones, "'I led them down [to Keshia's house] but I didn't do nothing to her." (R. 1443.) Sykes stated that the cartel's plan was to "kidnap her, take her to Memphis and use her in some kind of sex ring." Sykes told Agent Jones that he gave cartel members the location of the abandoned mobile homes in Mississippi as a place where Keshia's vehicle could be burned; Sykes could not explain why geolocation tracking of his cell phone placed him in the vicinity of the burned vehicle.

Sykes initially denied to Agent Jones being taken anywhere by Scott on the day Keshia disappeared but amended his statement once he was presented with his cell-phone records. Sykes stated that Scott did pick him up at work and drop him off near Keshia's house, but that instead of going to her house, he ran to a nearby church to rendezvous with cartel members. At that meeting, Sykes told them Keshia was at

her house along with her daughter; Sykes instructed them to bring his daughter Brooklyn to him at his house.

Agent Jones confronted Sykes with the presence of blood in his truck. Sykes speculated that the cartel had placed the blood in his truck to incriminate him. Sykes also told Agent Jones that he had heard there was a lot of blood inside Keshia's house. Sykes stated that "he would not doubt that she actually cut herself to make it look like she'd got hurt and that he wouldn't be surprised if she resurfaced in Vernon after she sobered up." (R. 1449.)

Agent Jones spoke to Sykes five days later, on April 15, at Sykes's request. Sykes told Agent Jones that if the district attorney was "willing to offer him a deal, that he would be willing to cooperate and give Keshia's family some closure." (R. 1452.) Sykes added that if no offer were made, the district attorney would "just have to do it the hard way." (R. 1452.)

Jacob Wiley was incarcerated with Sykes at the Pickens County Jail in May 2017. Wiley had known Sykes for approximately 12 years by that point, having first met him at a hunting and fishing club. Wiley testified that the two spoke every day while they were in jail and that the conversations eventually turned toward the reasons for their

14

incarcerations. Sykes told Wiley that he was in jail on a capital-murder charge. Sykes did not expressly identify his victim but did describe the actions that gave his rise to his charge. Sykes explained to Wiley that he had "beat her up and threw her in his truck" and that "he took her and dumped her" "where we used to go fishing." (R. 1418.) Wiley testified that the two used to fish the Sipsey River. Sykes told Wiley that he had dumped the body "down past the boat launch" and that he had tied the body with ratchet straps and weighted it down with cinder blocks. Despite search efforts in the area described by Wiley, Keshia's body was not recovered.

## Standard of Review

Rule 45A, Ala. R. App. P., as amended effective January 12, 2023, provides:

> "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

This Court will continue to review the entire record for plain error in all cases in which the death penalty has been imposed, although our analysis

15

on issues reviewed for plain error may not be as extensive as has been this Court's practice historically. Iervolino v. State, [Ms. CR-21-0283, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023).

> "'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.' Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is 'error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). 'To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). 'The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.' Ex parte Trawick, 698 So. 2d at 167. '[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error.' Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007). Thus, '[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.' Wilson v. State, 142 So. 3d 732, 751 (Ala. Crim. App. 2010). '[T]he plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982))."

DeBlase v. State, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018).

<u>Analysis</u>

I.

During rebuttal closing arguments, the prosecutor stated the following: "There's only two people in the world that know what happened in that house. One of them's dead, and the other one is sitting right over there at the end of that table. (Indicating)." (R. 1619.) Sykes asserts that the argument was a direct comment on his decision not to testify. Sykes did not object to the comment; he argues, though, that the circuit court's failure to take prompt curative action constituted plain error. This Court agrees.

In all criminal prosecutions, the accused shall not be compelled to give evidence against himself. Alabama Constitution, Art. I, § 6. The right against self-incrimination is likewise enshrined in the Alabama Code:

> "On the trial of all indictments, complaints or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request shall not create any presumption against him nor be the subject of comment by counsel. If the district attorney makes any comment concerning the defendant's failure to testify, a new trial must

17

be granted on motion filed within 30 days from entry of the judgment."

§ 12-21-220, Ala. Code 1975. "'[O]nce a defendant chooses not to testify at his trial the exercise of that choice is not subject to comment by the prosecution.'" Ex parte Davis, 718 So. 2d 1166, 1173 (Ala. 1998) (quoting Wherry v. State, 402 So. 2d 1130, 1133 (Ala. Crim. App. 1981)).

"Comments by a prosecutor on a defendant's failure to testify are highly prejudicial and harmful, and courts must carefully guard against a violation of a defendant's constitutional right not to testify. Whitt [v. State, 370 So. 2d 736, 739 (Ala. 1979)]; Ex parte Williams, 461 So. 2d 852, 853 (Ala. 1984); see Ex parte Purser, 607 So. 2d 301 (Ala. 1992). This Court has held that comments by a prosecutor that a jury may possibly take as a reference to the defendant's failure to testify violate Art. I, § 6, of the Alabama Constitution of 1901. Ex parte Land, 678 So. 2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S. Ct. 308, 136 L. Ed. 2d 224 (1996); Ex parte McWilliams, 640 So. 2d 1015 (Ala. 1993); Ex parte Wilson, [571 So. 2d 1251, 1261 (Ala. 1990)]; Ex parte Tucker, 454 So. 2d 552 (Ala. 1984); Beecher v. State, 294 Ala. 674, 320 So. 2d 727 (1975). Additionally, the Fifth and Fourteenth Amendments of the United States Constitution may be violated if the prosecutor comments upon the accused's silence. Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965); Ex parte Land, supra; Ex parte Wilson, supra. Under federal law, a comment is improper if it was '"'manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify'"' United States v. Herring, 955 F.2d 703, 709 (11th Cir.), cert. denied, 506 U.S. 927, 113 S. Ct. 353, 121 L. Ed. 2d 267 (1992) (citations omitted); Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S. Ct. 534, 102 L. Ed. 2d 566

18

(1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S. Ct. 440, 83 L. Ed. 2d 365 (1984). The federal courts characterize comments as either direct or indirect, and, in either case, hold that an improper comment may not always mandate reversal.

"Consistent with this reasoning, Alabama law distinguishes direct comments from indirect comments and establishes that a direct comment on the defendant's failure to testify mandates the reversal of the defendant's conviction, if the trial court failed to promptly cure that comment. Whitt v. State, supra; Ex parte Yarber, [375 So. 2d 1231, 1233 (Ala. 1979)]; Ex parte Williams, supra; Ex parte Wilson, supra. On the other hand, 'covert,' or indirect, comments are construed against the defendant, based upon the literal construction of Ala. Code 1975, § 12-21-220, which created the 'virtual identification doctrine.' Ex parte Yarber, 375 So. 2d at 1234. Thus, in a case in which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So. 2d at 1234; Ex parte Williams, supra; Ex parte Wilson, supra; Ex parte Purser, supra."

Ex parte Brooks, 695 So. 2d 184, 188-89 (Ala. 1997) (footnote omitted).

Our decision here is controlled by the opinions of the Alabama Supreme Court in Whitt v. State, 370 So. 2d 736 (Ala. 1979), and Ex parte Wilson, 571 So. 2d 1251 (Ala. 1990). In Whitt, the defendant had been indicted for first-degree murder arising out of a fatality in an automobile collision. The defendant was ultimately convicted of second-degree murder and was sentenced to 25 years in prison. This Court affirmed the

19

defendant's conviction and sentence. The Alabama Supreme Court granted the defendant's petition for a writ of certiorari to consider whether the prosecutor had made an impermissible comment on the defendant's failure to testify.

The defendant in Whitt neither testified nor called any witnesses on his behalf. During closing arguments, the prosecutor remarked: "The only person alive today that knows what happened out there that night is sitting right there." Defense counsel objected to the comment and moved for a mistrial on the ground that the prosecutor had commented on the defendant's failure to testify.

The trial court denied the defendant's motion and instructed the jury: "I am going to instruct the jury though to disregard the last remark in regard to that. The statement made by the District Attorney in his argument is only his inferences from the evidence, but I want you to disregard the last remark, just what he said." Whitt, 370 So. 2d at 737.

This Court held that the remark "was 'argument in kind' to rebut remarks by petitioner's counsel, that it was only an 'indirect' reference to petitioner's failure to testify, and, finally, that any possible reference to

petitioner was 'eradicated' by the court's instructions." Whitt, 370 So. 2d

at 738. The Supreme Court rejected each holding.

> "We must disagree and hold that the remark was <u>not</u> an 'argument in kind,' was <u>not</u> an 'indirect' reference to the petitioner's failure to testify, and was <u>not</u> 'eradicated' by the court's instructions.
>
> "The comment 'The only person alive today that knows what happened out there that night is sitting right there' is almost identical to the comment '"No one took the stand to deny it"' held to be a <u>direct</u> comment on the defendant's failure to testify and held to be <u>reversible</u> error in <u>Beecher [v. State]</u>, 294 Ala. 674, 320 So. 2d 727 (1975) (per Justice Embry). The comment is very close to the comment made in <u>Warren v. State</u>, 292 Ala. 71, 288 So. 2d 826 (1973). There, this Court held (per Justice McCall) that the argument '"The only one that said he didn't sell it (marijuana) was the little brother' was also a <u>direct</u> comment on the failure of the defendant to testify and constituted <u>reversible</u> error. It is thus that we must conclude, based on the holding and rationale of those two cases, that the comment by the district attorney in this case was a <u>direct</u> comment on the failure of the defendant to testify and constituted <u>error</u> to reverse.
>
> "We cannot agree with the Court of Criminal Appeals that this comment was 'argument in kind' to rebut remarks made by petitioner's counsel. It seems self-evident that it cannot be 'argument in kind' when we do not have the defense counsel's argument to which this comment is said to reply. The record does not contain the closing arguments in this case.
>
> "....
>
> "This brings us to a consideration of the last ground given by the Court of Criminal Appeals for finding that the

21

second comment did not constitute reversible error, namely, whether the trial court's instructions to the jury cured such impermissible comment.

"We cannot agree that the trial court's instructions in this case were sufficient to cure the harmful effect of the district attorney's comment. The court stated:

> "'I am going to instruct the jury though to disregard the last remark in regard to that. The statement made by the District Attorney in his argument is only his inferences from the evidence, but I want you to disregard the last remark, just what he said. I will deny your motion.'

"In seeking to instruct the jury to disregard the remark, we think that the trial court's instructions fell short of what is required to effectively erase the <u>highly</u> prejudicial and <u>harmful</u> nature of such a comment.

"....

"We suggest that, at a minimum, the trial judge must sustain the objection, and should then promptly and vigorously give appropriate instructions to the jury. Such instructions should include that such remarks are improper and to disregard them; that statements of counsel are not evidence; that under the law the defendant has the privilege to testify in his own behalf or not; that he cannot be compelled to testify against himself; and, that no presumption of guilt or inference of any kind should be drawn from his failure to testify. With appropriate instructions, we hold that the error of the prosecutor's remarks will be sufficiently vitiated so that such error is harmless beyond a reasonable doubt. <u>U. S. v. Brown</u>, 546 F.2d 166 (5th Cir. 1977); <u>Chapman v. California</u>, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); <u>Beecher v. State</u>, supra."

22

370 So. 2d at 738 (emphasis in original.)

The Alabama Supreme Court was confronted with a similar remark by the prosecutor in Ex parte Wilson, supra. In Wilson, the defendant had been convicted of three counts of capital murder and sentenced to death. Following this Court's affirmance of the defendant's convictions and sentence, the Alabama Supreme Court granted the defendant's petition for a writ of certiorari to consider, among other things, the propriety of the following argument made during the State's rebuttal in closing arguments: "'I can't tell you what that woman went through during that night, because there is only one eyewitness, and he ain't going to tell you. I wish I could tell you all of that. I can give you this evidence that these officers have worked meticulously to gather up ....'" Wilson, 571 So. 2d at 1259. The defendant moved for a mistrial, asserting that the argument was "'the equivalent of saying that this defendant has not testified.'" Id. The State countered that the remark was a reasonable inference from the evidence, specifically, a taped confession given by the defendant. The trial court denied the defendant's motion for mistrial, and the prosecutor resumed his rebuttal: "When I say that, I mean this defendant didn't tell you on that tape recording that he gave Alvin Kidd

23

as to what she went through ...." Id. The trial court gave a lengthy instruction after closing arguments had concluded regarding a defendant's right not to testify.

The State argued before the Alabama Supreme Court that the prosecutor's "comment was not on the defendant's failure to testify, ... that his explanatory sentence 'made it clear to the jury that he was referring to the defendant's sketchy incriminating statements, which had been admitted into evidence,'" and that the jury would not have reasonably understood the remark to be a comment on the defendant's failure to testify. Wilson, 571 So. 2d at 1260. The Court was unpersuaded. Relying heavily on Whitt, the Alabama Supreme Court held the remark combined with the trial court's failure to promptly cure the remark to be reversible error:

> "The statements in this case do not fall within the bounds set forth in Ex parte Dobard, [435 So. 2d 1351 (Ala. 1983)], or Beecher [v. State, 294 Ala. 674, 320 So. 2d 727 (1975)].[3] The district attorney clearly did not comment generally on the State's evidence standing uncontradicted. His statement falls well outside the permitted range available to a district attorney in closing and is far more prejudicial

---

[3] In those cases, the Alabama Supreme Court held that, "[w]here the State's evidence does stand uncontradicted, the prosecutor does have the right to point this out to the jury." Beecher, 294 Ala. at 682, 320 So. 2d at 734.

24

than those statements deemed to be indirect comments in <u>Ex parte Williams</u>, [461 So. 2d 852 (Ala. 1984)]. <u>See also</u> <u>Stain v. State</u>, 494 So. 2d 816 (Ala. Crim. App. 1986) (court unable to distinguish comment from that in <u>Williams</u>). …

"….

"We find here that the comment made by the district attorney was a direct comment on the defendant's failure to testify and violated the defendant's rights as found under the United States Constitution, the Constitution of Alabama of 1901, and Ala. Code (1975), § 12-21-220. We cannot agree that the comment made by the district attorney could have been understood by the jury only as a reference to the defendant's 'sketchy incriminating statement.'"

<u>Wilson</u>, 571 So. 2d at 1263-65.

The remark in the instant case – "There's only two people in the world that know what happened in that house. One of them's dead, and the other one is sitting right over there at the end of that table. (Indicating)." – closely parallels the remarks in <u>Whitt</u> and <u>Wilson</u>. The State asserts that, when viewed in context, the challenged remark was merely a response to the argument of defense counsel during his closing argument that there were gaps in the State's evidence. This Court finds the State's purported justification unavailing. Here, the prosecutor asserted to the jury that there were only two people who knew what had happened to Keshia – Keshia, who was dead and unable to testify, and

Sykes. The prosecutor's remark "called the jury's attention to the fact that [Sykes], the only eyewitness who <u>could</u> have taken the stand, did not testify." <u>Powell v. State</u>, 631 So. 2d 289, 291-92 (Ala. Crim. App. 1993) (emphasis in original).

In light of the holdings of the Alabama Supreme Court in <u>Whitt</u> and <u>Wilson</u>, this Court holds that the remark was a direct comment on Sykes's decision not to testify. Further, because the circuit court failed to take prompt curative action, this Court must reverse Sykes's convictions and sentence of death. <u>See</u> <u>Ex parte Wilson</u>, 571 So. 2d at 1261 ("In a case where there has been a direct reference to a defendant's failure to testify and the trial court has not acted promptly to cure that comment, the conviction must be reversed.").

## II.

Although this Court is reversing Sykes's convictions and sentence of death based on the prosecutor's direct comment on Sykes's decision not to testify in conjunction with the circuit court's failure to take prompt curative action, this Court must address an issue that may arise in a possible retrial – the appropriate capital-sentencing scheme to be applied should Sykes again be convicted of capital murder.

Act No. 2017-131, Ala. Acts 2017, amended §§ 13A-5-45, 13A-5-46, and 13A-5-47, Ala. Code 1975, to, among other things, remove the circuit court's authority to override a jury's sentencing verdict, thereby making the jury the final sentencing authority in capital cases. Section 13A-5-47.1, Ala. Code 1975, states that this new capital-sentencing scheme "shall apply to any defendant who is charged with capital murder after April 11, 2017, and shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to April 11, 2017."

On April 9, 2015, Sykes was arrested on suspicion of kidnapping Keshia. That charge was elevated in May 2015 when Sykes was indicted in case no. CC-15-208 on two counts of murder made capital for intentionally killing Keshia Nicole Sykes during the commission of a first-degree burglary and for intentionally killing Keshia Nicole Sykes during the commission of a first-degree kidnapping. However, in April 2019, Sykes was reindicted in case no. CC-19-144 on three counts of murder made capital for intentionally killing Keshia Nicole Sykes during the commission of a first-degree burglary, for intentionally killing Keshia Nicole Sykes during the commission of a first-degree kidnapping, and for

27

intentionally killing Keshia Nicole Sykes during the commission of a first-degree robbery. It was on this indictment that Sykes was tried and convicted of three counts of capital murder.

On February 22, 2021, Sykes moved the circuit court to declare that, given the date of his reindictment, the new capital-sentencing scheme should apply to him. (C. 67-68.) At a pretrial hearing, the State agreed with Sykes's motion. The circuit court granted Sykes's motion on March 5, 2021. (C. 69.)

The new capital sentencing scheme is triggered by the date on which a defendant is charged with capital murder. Sykes was first charged with capital murder in the death of Keshia in May 2015, well before the effective date of the new capital-sentencing scheme – April 11, 2017. See Rule 1.4(b), Ala. R. Crim. P. ("'Charge' means a complaint, indictment, or information."). Therefore, the prior capital-sentencing scheme is applicable to Sykes, should he again be convicted of capital murder.

## Conclusion

The prosecutor made a direct comment during guilt-phase closing arguments on Sykes's decision not to testify and the circuit court failed

to take prompt curative action to correct the error. This constituted plain error. Therefore, this Court must reverse Sykes's convictions and sentence of death and remand the case for a new trial.

REVERSED AND REMANDED.

Kellum and Cole, JJ., concur. Minor, J., concurs in the result, with opinion. Windom, P.J., dissents, with opinion. McCool, J., recuses himself.

MINOR, Judge, concurring in the result.

I concur in the result. I write separately to explain why I think that the capital-sentencing scheme enacted by Act No. 2017-131, Ala. Acts 2017, may not apply to Brandon Dewayne Sykes's charges.

As the main opinion explains, law enforcement arrested Sykes in April 2015 on suspicion of kidnapping Keshia Nicole Sykes. According to a motion Sykes filed and the State's appellate brief, the grand jury indicted Sykes in May 2015 in case no. CC-15-208 for two counts of murder made capital for intentionally killing Keshia during the commission of a first-degree burglary and a first-degree kidnapping.[4] (C. 67; State's brief, p. 1.) In April 2019, the grand jury indicted Sykes in case no. CC-19-144 on three counts of capital murder: intentionally killing Keshia during the commission of a first-degree burglary, intentionally killing Keshia during the commission of a first-degree kidnapping, and intentionally killing Keshia during the commission of a first-degree robbery. (C. 24-26.)

The main opinion also explains:

"Act No. 2017-131, Ala. Acts 2017, amended §§ 13A-5-45, 13A-5-46, and 13A-5-47, Ala. Code 1975, to, among other

---

[4]The record does not include the 2015 indictment.

things, remove the circuit court's authority to override a jury's sentencing verdict, thereby making the jury the final sentencing authority in capital cases. Section 13A-5-47.1, Ala. Code 1975, states that this new capital-sentencing scheme 'shall apply to any defendant who is charged with capital murder after April 11, 2017, and shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to April 11, 2017.' "

___ So. 3d at ___.

In her dissenting opinion, Presiding Judge Windom describes the 2019 indictment as nullifying the original 2015 indictment, citing Hulsey v. State, 196 So. 3d 342, 353 (Ala. Crim. App. 2015), and Ex parte Russell, 643 So. 2d 963, 965 (Ala. 1994).

In Hulsey, the grand jury returned four indictments against Hulsey. He was tried and convicted on the fourth indictment, which charged him with reckless endangerment and first-degree unlawful manufacturing of a controlled substance. Hulsey was not charged with first-degree unlawful manufacturing of a controlled substance until the fourth indictment, which was returned beyond the statute of limitations. On appeal, this Court held that "[b]ecause the previous indictments did not charge first-degree unlawful manufacture of a controlled substance, none of them tolled the statute of limitations as to that offense." 196 So. 3d at 352-53.

31

The State argued, in the alternative, that Hulsey should be convicted of the lesser-included offense of second-degree unlawful manufacture of a controlled substance. This Court noted that the second indictment, which was returned within the statute of limitations, charged Hulsey with that offense and thus tolled the statute of limitations. But because the third indictment was defective in charging Hulsey with that offense, the third indictment did not toll the statute of limitations. Thus, this Court held that Hulsey could not be guilty of second-degree unlawful manufacture of a controlled substance. 196 So. 3d at 355-56.

Russell involved a different but also complicated procedure:

"On October 3, 1991, an automobile driven by Willie Samuel Russell, Jr., collided in Tuscaloosa, Alabama, with an automobile owned and operated by the City of Tuscaloosa Police Department. Russell was promptly arrested, and prosecutions were initiated pursuant to (1) a Uniform Traffic Ticket and Complaint ('UTTC') charging him with the misdemeanor offense of driving while under the influence of alcohol ('DUI'); (2) a UTTC charging him with the misdemeanor offense of driving a vehicle while his driver's license was revoked ('DRL'); and (3) a complaint signed by Officer S.L. Stimpson charging him with the felony offense of leaving the scene of an accident involving personal injury, as prohibited by Ala. Code 1975, §§ 32-10-1(a) and -6.

"On November 18, 1991, a Tuscaloosa County grand jury considered and rejected the felony count, indicting Russell,

32

instead, on the charge of 'attempt[ing] to fail to ... stop at the scene of the ... accident'—a misdemeanor offense as defined by § 13A-4-2(d)(4). In February 1992, Russell was convicted on the charges of DUI and DRL. He appealed those convictions to the Tuscaloosa County Circuit Court.

"By October 23, 1992, Russell had been tried in the Tuscaloosa County District Court and there acquitted of the misdemeanor offense charged in the indictment. On that date, he moved the circuit court to dismiss the cases involving the DUI and DRL charges, contending that the court lacked subject-matter jurisdiction of the appeals in those cases. The circuit court agreed with Russell, and, on March 9, 1993, dismissed those cases.

"The City of Tuscaloosa ('the City') petitioned the Court of Criminal Appeals for a writ of mandamus directing the circuit court judge to vacate his judgment of dismissal and reinstate the cases. The Court of Criminal Appeals, with an opinion, granted the City's petition. Ex parte City of Tuscaloosa, 636 So. 2d 692 (Ala. Crim. App. 1993).

"In seeking from this Court a writ of mandamus directing the Court of Criminal Appeals to rescind its writ of mandamus, Russell contends that the circuit court's action was mandated by Ala. Code 1975, § 12-11-30(2), which, he insists, vested in the circuit court exclusive original jurisdiction of the DUI and DRL cases. Although the parties invite us to discuss a number of interesting questions tangentially related to this case, we confine our attention to the issue that, in our view, resolves this dispute, namely, the effect of the grand jury's indictment on the offense charged in Officer Stimpson's complaint, within the context of § 12-11-30(2).

"Section 12-11-30(2) provides in pertinent part: 'The circuit court shall have exclusive original jurisdiction of all felony prosecutions and of misdemeanor or ordinance

33

violations which are lesser included offenses within a <u>felony charge</u> or which arise from the same incident as a <u>felony charge</u> ....' (Emphasis added.) See also Ala. R. Crim. P. 2.2(a). Russell contends that the charge made in Officer Stimpson's complaint, and on which the arrest warrant was based, constituted a 'felony charge' within the meaning of this section. He insists that the DUI and DRL charges '[arose] from the same incident as [the] felony charge' and, consequently, that the circuit court, rather than the municipal court, had exclusive original jurisdiction of the DUI and DRL charges. He then reasons that because the circuit court had exclusive original jurisdiction, that court did not acquire jurisdiction on appeal after the cases had been, erroneously he contends, prosecuted in the municipal court.

"Russell's reasoning is based on the proposition that the complaint charging the commission of a felony offense irrevocably invoked the exclusive original jurisdiction of the circuit court. In effect, he insists that the grand jury's action, which reduced the felony charged in the complaint to a misdemeanor, was inconsequential. For the following reasons, we disagree with this proposition.

"A complaint instituting a criminal prosecution and authorizing an arrest is 'superseded' by the subsequent return of an indictment addressed to the same set of operative facts. See Ala. R. Crim. P. 7.6(a). In such cases, a party is 'tried on the charge in the <u>indictment</u> and not on the warrant of arrest or its supporting affidavit.' <u>Henry v. State</u>, 57 Ala. App. 383, 388, 328 So. 2d 634, 638 (Ala. Crim. App. 1976) (emphasis added). Cf. <u>Wilson v. State</u>, 99 Ala. 194, 195, 13 So. 427, 427 (1893) (an indictment returned in proper form cures defects in an antecedent charging instrument); <u>Toney v. State</u>, 15 Ala. App. 14, 16, 72 So. 508, 509 (1916) (same); cf. also <u>Hansen v. State</u>, 598 So. 2d 1, 2 n.1 (Ala. Crim. App. 1991) (an indictment supersedes antecedent indictments); <u>Broadnax v. State</u>, 54 Ala. App. 546, 549, 310 So. 2d 265, 268 (Ala. Crim. App. 1975).

"Under these rules, the complaint, the original instrument charging the felony of leaving the scene of an accident, was <u>superseded</u> by the subsequent indictment containing the misdemeanor charge of <u>attempting</u> to leave the scene of an accident. In other words, the original charging instrument was <u>nullified</u> by the indictment, which was returned on November 18, 1991. When Russell was tried in the municipal court in February 1992 for DUI and DRL, no felony charge was pending; therefore, the exclusivity provision in § 12-11-30(2) was not triggered. The circuit court clearly possessed jurisdiction over those two cases when Russell appealed for a trial <u>de novo</u>, and it erred in dismissing them."

643 So. 2d at 964-65.

I am not persuaded that <u>Hulsey</u> or <u>Russell</u> are controlling. First, there is no issue about the statute of limitations. Second, there is no issue about which court had jurisdiction over the capital-murder charges. Finally, there is no question that Sykes was charged with capital murder when he was arrested and indicted in 2015, and it appears that the 2015 indictment included two of the three capital murder charges included in the 2019 indictment.

Act No. 2017-131, Ala. Acts 2017, applies to all defendants charged after April 11, 2017. It does not expressly state that it applies to defendants charged before April 11, 2017, but not convicted and sentenced to death until after that date. This Court, however, has

35

affirmed the convictions and death sentences of defendants charged before April 11, 2017, but convicted and sentenced after that date. <u>See, e.g.</u>, <u>Dearman v. State</u>, [Ms. CR-18-0060, Aug. 5, 2022] ___ So. 3d ___ (Ala. Crim. 2022); <u>Young v. State</u>, 375 So. 3d 813 (Ala. Crim. App. 2021), <u>cert. denied</u> (No. 1210291, Oct. 21, 2022); and <u>Belcher v. State</u>, 341 So. 3d 237 (Ala. Crim. App. 2020), <u>cert. denied</u> (No. 1200374, May 21, 2021). Those decisions, as well as the plain language of Act No. 2017-131, Ala. Acts 2017, support the idea that Sykes is not subject to the new sentencing scheme under that act. Based on the materials before this Court, however, I believe it is premature to decide this question.

CR-2022-0546

WINDOM, Presiding Judge, dissenting.

The main opinion reverses Brandon Dewayne Sykes's capital-murder convictions and his sentence of death because, it holds, the prosecutor made a direct comment on Sykes's decision not to testify and the circuit court failed to take prompt curative action. Because I do not believe the prosecutor made a direct comment on Sykes's decision not to testify, I respectfully dissent.

During rebuttal closing arguments, the prosecutor stated: "There's only two people in the world that know what happened in that house. One of them's dead, and the other one is sitting right over there at the end of that table. (Indicating)." (R. 1619.) The main opinion, relying on the opinions of the Alabama Supreme Court in Whitt v. State, 370 So. 2d 736 (Ala. 1979) and Ex parte Wilson, 571 So. 2d 1251 (Ala. 1990), holds that the foregoing was a direct comment on Sykes's decision not to testify.

The remark by the prosecutor was admittedly similar to the remarks made by the prosecutors in Whitt and Wilson, as well as a remark made by the prosecutor in Powell v. State, 631 So. 2d 289 (Ala. Crim. App. 1993), which is also cited by the main opinion. In all three cases, as in this case, the prosecutor referenced the defendant's being the

37

only remaining eyewitness to the crime. Even so, I do not believe a reversal of Sykes's convictions and sentence is warranted under the circumstances here.

What distinguishes the remark at issue from the remarks made in Whitt, Wilson, and Powell is the context in which it was made. The State has assumed this position in its brief on appeal, asserting that, when viewed in context, the argument of the State in rebuttal was merely a reply in kind to the argument of defense counsel during his closing argument that there were gaps in the State's evidence. Indeed, "[a] challenged comment of a prosecutor made during closing arguments must be viewed in the context of the evidence presented in the case and the entire closing arguments made to the jury – both defense counsel's and the prosecutor's." Ex parte Brooks, 695 So. 2d 184, 189 (Ala. 1997).[5]

_____

[5] The State relies in its brief on the reply-in-kind doctrine. Sykes counters that the reply-in-kind doctrine is inapplicable here because he made no illegal argument. On this point, I agree with Sykes. "The reply-in-kind doctrine is designed to restore an equal playing field in the courtroom when one party violates the rules." Allstate Ins. Co. v. Ogletree, 331 So. 3d 1150, 1156 (Ala. 2021) (emphasis added); see Minor v. State, 914 So. 2d 372, 430 (Ala. Crim. App. 2004) ("It is a misapplication of this rule, however, to uphold an illegal argument under the guise of 'reply in kind,' where the initial argument, to which the purported reply is addressed, is itself a legally permissible comment to the jury."). Because Sykes's arguments in closing about the gaps in the

I believe <u>Ex parte Musgrove</u>, 638 So. 2d 1360 (Ala. 1993), and <u>Ex parte Brooks</u>, 695 So. 2d 184 (Ala. 1997), are instructive. In <u>Musgrove</u>, the Alabama Supreme Court examined the following rhetorical questions posed to the jury by the prosecutor during rebuttal closing arguments: "What did you hear from the defense?" and "What did you hear from the Defendant?" The appellants objected, asserting that the questions were comments on their right not to testify. The appellants' objections to the questions were overruled, and the circuit court gave no curative instruction to the jury. Still, the Alabama Supreme Court found no error that warranted reversal. After reviewing the entirety of the closing arguments from both parties, specifically noting that defense counsel had "made repeated attacks upon the prosecution's presentation of its case and the prosecution's motivation for obtaining a conviction," <u>Musgrove</u>, 638 So. 2d at 1368, the Alabama Supreme Court endorsed this Court's

---

State's evidence were entirely appropriate, the State cannot now avail itself of the reply-in-kind doctrine to excuse its remark on rebuttal.

Nonetheless, the fact that the State's remark was made in response to arguments raised by Sykes is relevant because it provides context for the challenged remark.

39

holding with respect to the prosecutor's question, "What did you hear from the Defendant?":

> "'[This comment,] when viewed in the context of the entire argument, did not refer to the appellants' failure to testify, but was rather the prosecutor's opening into a summary of the case presented by the defense. The comment was clearly not a direct reference to the appellants' failure to testify because it was not '"manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify."' [Citations omitted.] Nor was this comment an indirect reference to the appellants' failure to testify and there was no "close identification" of the appellants as the exact people who did not become witnesses. [Citation omitted.] This statement by the prosecutor was merely a general opening statement to a recapitulation of the defense's case.'
>
> "Musgrove and Rogers v. State, 638 So. 2d 1347, 1359 (Ala. Crim. App. 1992).
>
> "We agree."

Ex parte Musgrove, 638 So. 2d at 1369 (emphasis added in Ex parte Musgrove).

Similarly, in Ex parte Brooks, supra, the Alabama Supreme Court considered the following argument, which was allowed by the trial court over defense counsel's objection:

40

> "'In that connection I ask [defense counsel], the last thing I said before I sat down was to get up here and tell these people what's the reasonable hypothesis that's consistent with his innocence? That says anything other than he intentionally killed her while he raped and robbed her in her apartment. Have you heard it yet? Of course not.
>
> "....
>
> "Well, have you heard one word in this courtroom since Tuesday morning, one word in this courtroom since Tuesday morning, that causes you to believe there's a reasonable hypothesis of innocence, that is anything except compelling of his guilt from this evidence proposed to you by [defense counsel] in argument or otherwise?"

Ex parte Brooks, 695 So. 2d at 187. Again, the Alabama Supreme Court reviewed the entirety of the parties' closing arguments and recognized that defense counsel had

> "argued that the State's evidence, because of its circumstantial nature, was insufficient to prove beyond a reasonable doubt that the defendant had committed the crimes. Defense counsel insisted that the evidence created a reasonable hypothesis of the defendant's innocence because there were unidentified fingerprints, unidentified pubic hair, and unidentified semen at the crime scene, which, defense counsel contended, suggested that another person had committed the crimes."

Id. at 189. The Alabama Supreme Court held that "in the context of the evidence and the closing arguments of both the defense and the State,

41

the statements at issue were not a reference to the defendant's failure to testify, but rather were a reply to the insufficiency argument made by defense counsel that the evidence suggested a reasonable hypothesis of the defendant's innocence and that the State had failed to eliminate that hypothesis." Id.

I believe the main opinion focuses too much on the remark itself and ignored the context in which that remark was made. After all, in isolation, it would be difficult to craft an argument that more directly comments on a defendant's decision not to testify than the remark in Ex parte Musgrove – "What did you hear from the Defendant?" But, as in Ex parte Musgrove and Ex parte Brooks, this Court should not view the remark in isolation but rather should look to the evidence offered at trial and the entirety of the closing arguments to gather the context in which the allegedly improper remark was made.

In this case, a primary theory of Sykes's guilt-phase defense was that law enforcement did not know what had happened to Keshia Sykes and, in fact, could not even be certain that she was dead. Defense counsel harped on this theory during his closing arguments:

42

"I asked [Agent] Andy Jones [of the Alabama Bureau of Investigation] right here, 'Is Keshia Sykes dead?' He says, 'I can't say for a fact.'

"Do you know why there's a charge for Kidnapping, one for Robbery and one for Burglary? Because the State has no real theory of what this case is about. They figure, 'If we just throw enough stuff up against the wall, something will stick.'

"So is it Burglary? Did he come through the window in the back? …

"….

"So what's the method of death? What did he do with the body? When did he move the body? …

"….

"… And you remember if anybody sat on this stand and said, 'You know what? With that amount of blood lost, you expect somebody to be dead.' This is the serious physical injury.

"Did you hear him? No. And you know why? Nobody knows. Nobody knows.

"….

"And that's what this is about. Someone who is missing. Someone who told Clara Hollis, 'You think I'll get my' – 'my disability money? Because if not, I'm leaving in February anyway.'

"What was the impetus for her to leave? Think about the testimony of all of the things. Think about the Burglary, the Robbery, the Kidnapping.

"You know, they are just saying it had to be one of those. It had to be one of those. Is there any evidence of that?

"....

"So we have no idea of a time of death. We think it's sometime allegedly between 8:00 and 8:58. Old Highway 18 right in Vernon just right off the road.

"You are going to tell me that Brandon Sykes went inside, whether Robbery, Burglary, Kidnapping, beat the hell out of her, cleaned up, did something with the body and was at his sister's house by 9:00 o'clock?

"....

"… Consider the fact they have no idea how anything happened; but yet, they are wanting you to find him guilty.

"Consider the facts just like Andy Jones said, 'I can't say for a fact she's dead,' and find him not guilty.

"Thank you."

(R. 1598-1607.) The prosecutor responded to defense counsel's argument

in his rebuttal:

"One thing [defense counsel] brought up is what happened in the house. The State doesn't know it. The State doesn't know. I'll concede some of that. We don't know exactly what happened in the house.

"There's only two people in the world that know what happened in that house. One of them's dead, and the other one is sitting right there at the end of that table. (Indicating.) Those are the only two people that know what happened in that house, but we can look at the facts in evidence."

44

(R. 1619) (emphasis added.) The prosecutor then addressed the evidence that supported the State's theory of a brutal murder of Keshia. Viewed in context, I do not believe the prosecutor's challenged remark, which is emphasized above, was "'manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" Ex parte Brooks, 695 So. 2d at 188 (quoting United States v. Herring, 955 F.2d 703, 709 (11th Cir. 1992)).

In Whitt, the Alabama Supreme Court was precluded from considering the context of the challenged remark because the record did not contain the closing arguments. Whitt, 370 So. 2d at 738. In Wilson, the prosecutor referenced the defendant's being the only eyewitness and added that "'he ain't going to tell you'" what happened. Ex parte Wilson, 571 So. 2d at 1260. In Powell, the prosecutor specifically drew the jury's attention to the fact that the deceased victim could not "come in and testify," which left the defendant as the only eyewitness who could have taken the stand. Powell, 631 So. 2d at 290. In contrast, in this case the prosecutor's argument followed a lengthy challenge to the evidence, or purported lack thereof, made by defense counsel, and the prosecutor even

prefaced the challenged argument with a reference to the specific argument of defense counsel that he intended to address.

Additionally, I believe this Court must be mindful that the jury was specifically instructed by the circuit court that the burden of proof rested upon the State and that Sykes was not required to prove his innocence. (R. 1654.)  The circuit court also gave the following instruction:

> "The Court charges the jury that the fact that that the Defendant did not testify in this case cannot be considered in determining the Defendant's guilt or innocence.
>
> "No inference or conclusion should be drawn by the jury from the fact that the Defendant was not sworn and put on the witness stand as a witness in his own behalf, nor should this fact have any weight with the jury in reaching a verdict."

(R. 1657.)

In sum, I believe that the jurors would have perceived the remark not as a comment on Sykes's decision not to testify but rather for what it was – a rebuttal to defense counsel's closing argument.  See Thomas v. State, 824 So. 2d 1, 26 (Ala. Crim. App. 1999), overruled on other grounds, Ex parte Carter, 889 So. 2d 528, 533 (Ala. 2004) ("We reiterate that we look at the impact of an allegedly improper comment in the context of the entire proceeding, and that we do not view the comment in the abstract."  (citing McWhorter v. State, 781 So. 2d 257 (Ala. Crim. App.

46

1999))). It would seem, given the lack of an objection or a curative instruction, that defense counsel for Sykes and the circuit court perceived the remark in the same way.

I do not believe the challenged remark constituted a direct comment on Sykes's decision not to testify; consequently, I do not believe the circuit court committed plain error in failing to sua sponte provide a curative instruction. Therefore, I respectfully dissent from that portion of the main opinion.

I also disagree with the discussion in the main opinion about the appropriate capital-sentencing scheme to be applied should Sykes again be convicted of capital murder.

Act No. 2017-131, Ala. Acts 2017, created a new capital-sentencing scheme that placed the final sentencing authority in capital cases with the jury. I believe that by the express wording of the applicability statute – § 13A-5-47.1, Ala. Code 1975 – the new capital-sentencing scheme applies to Sykes's charges for capital murder.

Section 13A-5-47.1 contains two provisions – one that establishes to whom the new capital-sentencing scheme applies and one that establishes to whom the new capital-sentencing scheme does not. First,

§ 13A-5-47.1 states that the new capital-sentencing scheme "shall apply to any defendant who is charged with capital murder after April 11, 2017." As the main opinion points out, Sykes was first indicted in May 2015 in case no. CC-15-208 on two counts of murder made capital for intentionally killing Keshia Nicole Sykes during the commission of a first-degree burglary and for intentionally killing Keshia Nicole Sykes during the commission of a first-degree kidnapping. However, he was not tried on this indictment. In April 2019, Sykes was reindicted in CC-case no. 19-144 on three counts of murder made capital for intentionally killing Keshia Nicole Sykes during the commission of a first-degree burglary, for intentionally killing Keshia Nicole Sykes during the commission of a first-degree kidnapping, and for intentionally killing Keshia Nicole Sykes during the commission of a first-degree robbery. It was on this indictment that Sykes was tried and convicted. It seems indisputable that Sykes was, in fact, "charged with capital murder after April 11, 2017." § 13A-5-47.1.[6] Looking to the date on which Sykes was

---

[6] This Court has recognized that "an original charging instrument is nullified by a subsequent indictment" and that "a subsequent indictment that changes an offense of a previous indictment is not an amendment to the previous indictment; it is a new indictment that supersedes, nullifies, and replaces the previous indictment." Hulsey v.

first charged with capital murder appears to read into the statute a qualifier that does not exist.

Next, § 13A-5-47.1 states that the new capital-sentencing scheme "shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to April 11, 2017." Sykes was sentenced to death on April 5, 2022; thus, this provision of § 13A-5-47.1 clearly does not exclude Sykes from being sentenced under the new capital-sentencing scheme.

In light of the procedural history of Sykes's case, I believe the circuit court properly determined that the new capital-sentencing scheme was applicable to Sykes's charges for capital murder. Therefore, I respectfully dissent from that portion of the main opinion as well.

---

State, 196 So. 3d 342, 353 (Ala. Crim. App. 2015); Ex parte Russell, 643 So. 2d 963, 965 (Ala. 1994).